UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
Eastern Division

In re:

OLD COLONY, LLC,

           **Debtor.**

Chapter 11

Case No. 10-21100-HJB

**MOTION FOR ORDER AUTHORIZING AND APPROVING
USE OF CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION**

Old Colony, LLC, the debtor in the within Chapter 11 reorganization proceeding (the "Debtor"), hereby moves this Court for entry of interim and final orders pursuant to 11 U.S.C. §§363(c)(2)(B) and (c)(3), Rule 4001 (b)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and MLBR 4001-2; (i) authorizing the Debtor's interim and final use of cash collateral; and (ii) granting replacement liens as described herein to the holders of an interest in cash collateral as adequate protection for any diminution in value which may result from the Debtor's use of cash collateral; and (iii) setting a hearing on final authorization for use thereof. The Debtor has submitted the declaration of Joseph Cuzzupoli in support of "first day" relief (the "Declaration") in support of, *inter alia*, this motion (the "Motion"). In further support of the within Motion, the Debtor respectfully states as follows:

**Jurisdiction**

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157 and 1334. This is a "core" proceeding pursuant to 28 U.S.C. §157(b). Venue is

proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. §§ 363(c)(2)(B) and (c)(3).

### Background

2. The Debtor commenced this reorganization proceeding by the filing of a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code") on October 11, 2010 (the "Petition Date").

3. The Debtor continues to operate its business and manage its affairs as a debtor-in-possession pursuant to Section 1107 and 1108 of the Bankruptcy Code.

4. The Debtor is a limited liability company formed in 2007 which has a principal place of business in Saugus, Massachusetts. The Debtor owns and operates an 83-room resort hotel located in Teton Village, Wyoming known as The Inn At Jackson Hole (the "Inn"). Additionally, the Debtor leases space to a third party which operates a 60-seat restaurant at the aforesaid resort hotel premises.

5. The Debtor purchased the Inn in or about May, 2007 for an initial purchase price of $26,000,000. The acquisition was financed through (i) a cash payment of approximately $6,000,000 derived from capital contributions made to the Debtor by its initial members; (ii) a loan in the amount of $16,500,000 from Jackson State Bank & Trust ("Jackson State"); and (iii) seller financing in the amount of $3,500,000 from Johnson Resort Properties, Inc. (the "Johnson Loan"). The Johnson Loan was evidenced by a promissory note which provided for the payment of interest only during the one year term of the Loan.

6. The Debtor required approximately $20 million in financing to consummate the acquisition of the Inn and related assets. Until shortly prior to the scheduled closing on the acquisition, it was contemplated by all parties to the transaction that Jackson State

would provide the entire $20 million in required financing. Shortly before the closing date, however, the Debtor was notified by a senior officer of Jackson State that the bank would be able to loan only $16.5 million of the purchase price at closing due to an issue relating to the age of the bank's appraisal of the property. In order to avoid delaying the closing until receipt of an updated appraisal, and the resultant loss of summer season income, the aforementioned bank officer arranged for the seller (a long-term customer of the bank) to provide the additional $3.5 million in short term subordinated financing as a bridge facility until the bank could refinance the entire amount after receipt of updated appraisals. On numerous occasions both prior to the closing of the transaction and for several months thereafter, Jackson State representatives assured the Debtor that the bank would provide the financing necessary to satisfy the Johnson Loan promptly upon the receipt of the updated appraisal. Notwithstanding such representations, following receipt of the updated appraisal in the fall of 2007[1], Jackson State, without adequate explanation, delayed the processing and delivery of documentation required to refinance the loans against the property. In early January, 2008, less than four months prior to the maturity of the Johnson Loan, the Debtor was informed that Jackson State had entered into an agreement to be purchased by Wells Fargo, N.A. ("Wells Fargo"), and that internal policies of Wells Fargo would preclude Jackson State from refinancing the then existing loans as promised.

7. Although the Debtor conducted a diligent search for replacement financing, given the extremely short time prior to the maturity date of the Johnson Loan, and the existence of the $16.5 million senior indebtedness, the Debtor was unable to locate an

---

[1] Upon information and belief, the updated appraisal reflected a value of $33 million for the financed assets.

institutional lender willing to provide financing necessary to retire the Johnson Loan. Ultimately, the Debtor was forced to enter into a transaction with a private lender, JH Lending Trust, on extremely onerous terms, including an interest rate of 15% (the "JH Loan"). The JH Loan closed in or about May, 2008. The Debtor anticipated that the JH Loan would be short term and, in light of the value of the property, further anticipated that it would be able to obtain a single institutional loan to satisfy the combined indebtedness of Wells Fargo and JH Trust, thereby eliminating the payment of 15% interest on the $3.5 million JH Loan. Shortly thereafter, however, the financial credit markets experienced a sharp contraction, and thereafter disappeared almost entirely, making a refinance of the combined loans an impossibility. Thus, at the present time, the Inn is subject to loans and alleged liens in favor of Wells Fargo and JH Lending Trust (collectively, the "Mortgage Lenders"). Wells Fargo asserts an aggregate indebtedness of approximately $17,500,000 and JH Lending Trust asserts an indebtedness of approximately $3,500,000.

8. In light of the effect of the credit market contraction on the Debtor's efforts to refinance its loans, together with a general decline in real estate values and overall economic malaise adversely impacting the resort hospitality industry, the Debtor became incapable of servicing all of its alleged secured debt. The Debtor commenced this proceeding to restructure the indebtedness related to the Inn to stabilize it continued operations.

**Relief Requested**

9. Pursuant to this Motion, the Debtor seeks authorization to use post-petition proceeds generated from hotel room rental as well as other rental and miscellaneous

4

income generated by the Debtor, including potential cash collateral, to operate its business in the ordinary course, in the amounts and for the purposes set forth in the budget attached hereto and incorporated herein as Exhibit A (the "Budget") and for payment of any other amounts as hereafter may be ordered by this Court. The Debtor requires the use of cash to fund business operations, preserve and maintain the value of its assets and the collateral of its various purported lien creditors, and to avoid irreparable harm to its reorganization efforts. Because budgeted expenses are based upon projections and actual expenses and timing of payment may vary from projected amounts, the Debtor respectfully requests that it be authorized to pay any such actual expenses so long as they do not vary from the projections by more than ten percent (10%) on a line item and collective basis.

**Basis for Relief**

10. Section 363(a) of the Bankruptcy Code defines "cash collateral" as: [C]ash, negotiable instruments. documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title. 11 U.S.C. §363(a).

11. Section 552(b) of the Bankruptcy Code provides:

> [I]f the Debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the Debtor acquired before the commencement of the case and to proceeds, then such security interest extends to such proceeds, products, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to

the extent the court, after notice and a healing and based on the equities of the case, orders otherwise.

11 U.S.C. §552(b).

12. In light of the foregoing, the term "cash collateral" in this case may include the rental proceeds generated from the operation of the Inn ( "Cash Collateral"). *See Prudential Ins. Co. of Am. v. Boston Harbor Marina Co.,* 159 B.R. 616 (D. Mass. 1993) (holding that rents are subject to cash collateral security interests).

13. In order to effectuate a reorganization, the Debtor requires the use of the rental revenue, some or all of which may constitute cash collateral of the Mortgage Lenders.

**Applicable Law**

14. Section 363(c)(2) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "may not use, sell or lease cash collateral under paragraph (1) of this subsection unless - (A) each entity that has an interest in such cash collateral consents; or (B) the Court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. §363(c)(2).

15. Section 363(e) of the Bankruptcy Code provides that a party with an interest in property proposed to be used, sold or leased by a debtor must receive adequate protection of such interest before the debtor may use, sell or lease such property.

16. The term "adequate protection" is not specifically defined in the Bankruptcy Code. It is generally accepted, however, that a debtor must propose some form of relief that will protect the secured party against any post-petition erosion in the value of its collateral, pending the outcome of the bankruptcy proceedings. *See also, In re Cumberland Farms, Inc.*, 162 B.R. 62 (Bankr. D. Mass. 1993) (holding that a post-

petition decline in value of collateral must occur to warrant adequate protection); *In re Ledgemere Land Corp.*, 125 B.R. 58, 61 (Bankr. D. Mass. 1991). The purpose of requiring adequate protection is merely to preserve the secured creditor's interest in its collateral as it existed at the time of the bankruptcy filing. *See, In re Melson*, 44 B.R. 454 (Bankr. D. Del. 1984).

17. With respect to cash collateral, provided that the debtor generates a continuous income stream from the continued use of a secured creditor's collateral, the debtor's use of cash proceeds does not diminish the value of the collateral. On the contrary, where cash proceeds are being used to generate new "replacement" collateral of equal value, the creditors' interests will not decline in value and a lien on the replacement collateral will adequately protect the secured party. *See, In re Mullen*, 172 B.R. 473,475 (Bankr. D. Mass. 1994).

18. Moreover, when an alleged secured creditor's interest in collateral extends to cash and non-cash collateral, those interests are not viewed in isolation for purposes of adequate protection:

> Bay Bank's unchanging collateral position also becomes apparent when one realizes that the value of accruing rents is an integral part of the real estate itself. The value of commercial real estate depends largely, if not exclusively, upon its rental income.

*Id*. at 478. That is particularly true where the rents are used to maintain the non cash collateral:

> Consumption of those rents in the Debtor's real estate operations has no adverse effect upon the mortgage value. Indeed, it has a positive affect. If the rents were not used to pay for management, taxes and maintenance of the properties, the value of Bay Bank's mortgage interest would rapidly decline.

*Id.*

**Request to Use Cash Collateral**

19. The projected Budget sets forth the Debtor's estimated monthly cash receipts and disbursements for the period October 11, 2010 to January 16, 2011 (the "Projection Period").

20. As set forth in the Budget, the Debtor anticipates revenue during the Projection Period of approximately $512,000, and a positive cash flow of approximately $155,880.00 during the period (net of debt service).

21. As set forth above, the Mortgage Lenders assert an aggregate indebtedness of approximately $21 million. Permitting the Debtor's use of Cash Collateral will preserve the going concern value of the Inn, while at the same time augmenting the Cash Collateral. At the end of the Projection Period set forth in the Budget, after the utilization of Cash Collateral, the Debtor expects to have $155,880.00 in cash on hand. Thus, there is no anticipated erosion of the value of either the cash or the non-cash collateral of the mortgagees.

22. The use of Cash Collateral will not in any way diminish any of the mortgagees' interests in cash or non-cash collateral as of the Petition Date. It will preserve the going concern value of the Debtor's business and otherwise enhance or maintain the value of the alleged collateral of the alleged secured parties. *See, In re Robbins*, 119 B.R. 1, 4 (Bankr. D. Mass. 1990).

23. The Debtor's need for Cash Collateral is critical. If the Debtor is not authorized to use cash collateral as requested herein, the Debtor will suffer immediate

and irreparable harm. If the Debtor is not authorized to use Cash Collateral as set forth herein, the Debtor simply will not be able to continue its business operations. The consequence of a cessation of operations would be adverse to the interests of all parties to this case. Cessation of business operations would result in the immediate diminution of value of the Inn through the loss of the going business concern value, unsecured creditors would likely receive no value on account of their claims due to the diminution in value of the Inn, consumers with future room reservations would lose the benefit of deposits heretofore paid, and Teton Village would suffer the loss of a significant number of jobs.

24. The Debtor requests that this Court authorize and approve the Debtor's use of Cash Collateral for the Projection Period as set forth in the Budget for the payment of its operating expenses, plus such additional operating expenses which may arise during the Projection Period in an amount not to exceed ten percent (10%) of the disbursements projected in the Budget, either on a line item or an aggregate basis, and such other amounts as this Court may hereafter order, as well as to make such payments as may be ordered by this Court. In order to remain in possession of its property, continue its business activities, and protect its ability to reorganize, the Debtor must be permitted to use the Cash Collateral, and prepare for any minor fluctuations in its budgeted expenses in the course of its ordinary business operations.

25. In light of the foregoing, the Debtor respectfully submits it is clearly in the best interests of the Debtor, its creditors and its reorganization estate that it be allowed to continue to operate its business and pay all post-petition obligations to fully maintain its business and to satisfy all administrative expenses, pending confirmation of a Chapter 11 plan of reorganization. Absent the use of Cash Collateral, the Debtor will be unable to

continue to operate, will suffer immediate and irreparable harm and will be unable to reorganize. Even a temporary interruption or discontinuance of the Debtor's ability to fund operational expenses will may make it impossible to conduct business on a post-petition basis or to reorganize the Debtor's financial affairs.

26. The Debtor requests that this Court approve the interim relief requested and schedule a final hearing, at which time the Debtor will seek final approval of this Motion, authorizing the continued use of Cash Collateral through and including the week of January 10, 2011.

27. In filing this Motion, the Debtor does not concede or admit that the Mortgage Lenders or any other creditor or lender holds valid, perfected or enforceable prepetition liens or security interests in and to any of the Debtor's assets, and the Debtor does not waive the right to contest the validity, perfection or enforceability of their alleged pre-petition liens and security interests in and to such property and estate assets.

**Proposed Adequate Protection**

28. In order to provide the Mortgage Lenders and any other creditor of the Debtor which may have or assert an interest in Cash Collateral adequate protection on account of the Debtor's proposed use of Cash Collateral, the Debtor proposes to grant them replacement liens (the "Replacement Liens") on the same types of post-petition property of the estate (the "Post-Petition Collateral") against which they held liens as of the Petition Date (the "Pre-Petition Collateral"). The Replacement Liens shall maintain the same priority, validity and enforceability as the pre-petition liens of the First Mortgage Lenders or other creditors holding or asserting Cash Collateral interests. The Replacement Liens shall be recognized, however, only to the extent of any diminution in value of the Mortgage Lenders' or such other creditor's Pre-Petition Collateral after the

Petition Date resulting from the Debtor's use of the Cash Collateral during this Chapter 11 case.

### Notice

29. No trustee, examiner or creditors' committee has been appointed in this Chapter 11 case. Notice of this Motion has been served pursuant to MLBR 4001-2(b) upon the United States Trustee, each known taxing authority with a claim against the Debtor, if any, the Debtor's 20 largest unsecured creditors, the Debtor's alleged secured lenders and parties who have requested notice. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

### No Prior Request

30. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter an Order: (i) Authorizing the Debtor to use Cash Collateral on an emergency basis, pursuant to Section 363(c)(2)(B) of the Bankruptcy Code on the terms and conditions set forth herein, for its general ongoing business operations, pending further order of this Court; (ii) granting the Replacement Liens; and
(iii) granting such other and further relief as may be just and proper.

OLD COLONY, LLC

By its proposed counsel,

/s/ Donald F. Farrell, Jr.
Donald F. Farrell, Jr. (BBO 159580)
ANDERSON AQUINO LLP
240 Lewis Wharf
Boston, MA  02110
617-723-3600
Dated:  October 12, 2010                         dff@andersonaquino.com

11

# EXHIBIT A

**Inn at Jackson Hole Cash Forecast**
**Postpetition Obligations**
**Cash Flow Projections / Budget**

| Week | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 15 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date at Beginning of Week | 11-Oct | 18-Oct | 25-Oct | 1-Nov | 8-Nov | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | Total |
| Cash (Beginning of Week) | 30,650 | 16,204 | 39,144 | 5,874 | 23,477 | 25,052 | 12,128 | 21,420 | 44,870 | 55,375 | 88,125 | 91,575 | 118,725 | 118,930 | |
| **Cash Receipts** | 33,120 | 27,940 | 35,376 | 33,431 | 17,892 | 14,426 | 29,742 | 50,000 | 40,000 | 40,000 | 40,000 | 50,000 | 50,000 | 50,000 | 511,927 |
| **Postpetition Obligations** | | | | | | | | | | | | | | | |
| Trash Removal | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 200 | 200 | 200 | 200 | 1,800 |
| Operating Supplies | 500 | 500 | 500 | 250 | 250 | 250 | 250 | 250 | 500 | 500 | 1,500 | 2,500 | 1,500 | 1,500 | 10,750 |
| Utilities | 8,356 | | 6,000 | | | | 5,000 | | | | | 5,000 | | | 24,356 |
| Laundry | | 500 | 300 | | | | | | 500 | 700 | 1,500 | 2,000 | 3,000 | 2,000 | 2,000 | 12,500 |
| Website Bookings | 218 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 13,218 |
| Payroll and Payroll Taxes | 18,000 | | 15,500 | | 10,500 | | 10,500 | | 14,800 | | 18,500 | | 22,000 | | 109,800 |
| Sales Tax | | | 30,446 | | | 22,400 | | 3,200 | | | | 200 | - | - | 56,246 |
| Credit Card Commissions | | | | 3,000 | | | | 5,000 | | | | | 6,000 | | 14,000 |
| Contract Cleaning | | 500 | 500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 500 | 1,000 | 4,000 | 8,000 | 4,000 | 4,000 | 30,000 |
| Website Advertising | 1,867 | 1,000 | 1,000 | 1,000 | 1,867 | 1,000 | 1,000 | 1,000 | 1,867 | 1,000 | 1,000 | 1,000 | 1,867 | 1,000 | 17,468 |
| Internet (Compunet) | 550 | | | 850 | | | | | 850 | | | | 850 | | 3,100 |
| Telephone | 221 | | | 500 | - | - | - | - | 500 | - | - | - | 500 | - | 1,721 |
| Cable TV | 1,438 | | | 1,028 | | | | | 1,028 | | | | 1,028 | | 4,522 |
| Hotel Management Fees | 15,215 | 250 | 250 | - | - | - | - | 300 | 1,000 | 1,000 | 2,000 | 3,000 | 2,000 | 2,000 | 27,015 |
| Travel Agent Commissions | | 50 | 50 | | | | | | 50 | 50 | 250 | 250 | 250 | 250 | 1,200 |
| Health Insurance | | | | 5,500 | | | | | | 5,500 | | | 5,500 | | 16,500 |
| GL Property Insurance | | | 11,900 | | | | | | 2,600 | | | | 2,600 | - | - | 17,100 |
| Maintenance & Repairs | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 11,900 |
| Miscellaneous | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,500 |
| JH Air | | | | | | | | 10,000 | | | | | | | 10,000 |
| Total Expenditures | 47,565 | 5,000 | 68,646 | 15,828 | 16,317 | 27,350 | 20,450 | 26,550 | 29,495 | 7,250 | 36,550 | 22,850 | 49,795 | 13,050 | 386,696 |
| **Cash (End of Week)** | 16,204 | 39,144 | 5,874 | 23,477 | 25,052 | 12,128 | 21,420 | 44,870 | 55,375 | 88,125 | 91,575 | 118,725 | 118,930 | 155,880 | 155,880 |
| Date at end of Week | 17-Oct | 24-Oct | 31-Oct | 7-Nov | 14-Nov | 21-Nov | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec | 2-Jan | 9-Jan | 16-Jan | |