**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**Eastern Division**

| | |
|---|---|
| **In re:** ) | |
| ) | |
| **OLD COLONY, LLC,** ) | **Chapter 11** |
| ) | **Case No. 10-21100-HJB** |
| ) | |
| **Debtor** ) | |
| ) | |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION**

**OLD COLONY, LLC**
Plan Proponent

Donald F. Farrell, Jr. (BBO 159580)
ANDERSON AQUINO LLP
240 Lewis Wharf
Boston, MA  02110
617-723-3600
dff@andersonaquino.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**Eastern Division**

_____

In re:                                          )
                                                )
**OLD COLONY, LLC,**                            )          **Chapter 11**
                                                )          **Case No. 10-21100-HJB**
                                                )
          Debtor                                )
_____ )


**DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION**


**I.        INTRODUCTION**


    **A.  Purpose of Disclosure Statement**

       Old Colony, LLC, a Wyoming limited liability company, which is the debtor and debtor-in-possession in the within Chapter 11 case (the "Debtor" or "Old Colony"), is providing this Disclosure Statement (the "Disclosure Statement") to all of the Debtor's known creditors and to its equity security holders, pursuant to 11 U.S.C. § 1125, in order to permit them to make an informed judgment in exercising their right to vote on the Joint Plan of Reorganization proposed by the Debtor and Molokai Partners, LLC, a New Jersey limited liability company ("Molokai") (the "Plan"), described below. All capitalized terms used, but not defined, in this Disclosure Statement have the meanings ascribed to such terms in the Plan, a copy of which is attached as Exhibit A to this Disclosure Statement.


    **B.  Source of Information**

       The information contained herein has been compiled from records of the Debtor and its property manager, Metwest Terra Hospitality, LLC. ("Metwest Terra"), as well as from other information provided by the Debtor and its members, and Molokai.

**C.** **Disclaimers.**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF THE DEBTOR, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DECIDE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT.

ALL HOLDERS OF CLAIMS OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY THE PLAN AND THE EXHIBITS ATTACHED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT IN THE FUTURE. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.  THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY RAISED IN ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER ACTION, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATION. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

## II.    OVERVIEW AND PRE-PETITION HISTORY OF THE DEBTOR

The Debtor is a limited liability company organized under the laws of the State of Wyoming on or about May 11, 2007.  Approximately 73.14% of the ownership interests in Old Colony are held by Joseph Cuzzupoli and John Bullock[1].  Joseph Cuzzupoli has been the managing member of the limited liability company since its inception.  The Debtor owns and operates an 83-room mountainside hotel located at 3345 West Village Drive, Teton Village, Wyoming, doing business under the name "Inn at Jackson Hole" (the "Inn").  The Inn's facilities include an outdoor heated pool, banquet facilities and on-site conference center with meeting rooms capable of accommodating groups of 5-100 people.  Additionally, the Debtor leases premises to a third party operator of an on-site 60-seat restaurant and bar doing business as "Masa Sushi".

### Acquisition of Inn and Initial Financing

On or about May 11, 2007, the Debtor purchased approximately .97 acres of land, including improvements thereon consisting of an 83 room hotel, and an adjacent approximate 4,000 square foot strip of land.  The purchase price for the aforesaid assets was $26,000,000, which included personal property consisting of, among other things, a substantial amount of furniture, fixtures and equipment used in the operation of the hotel, restaurant and bar.

The acquisition was financed through (i) a cash payment of approximately $6,000,000 derived from capital contributions made to the Debtor by its initial members; (ii) a loan in the amount of $16,500,000 from Jackson State Bank & Trust ("Jackson State"); and (iii) seller financing in the amount of $3,500,000 from Johnson Resort Properties, Inc. (the "Johnson Loan").  Johnson Resort Properties owned and operated the hotel prior to its sale to the Debtor.  While owned by Johnson Resort Properties, the hotel was operated as a Best Western franchise hotel.  The Johnson Loan was evidenced by a promissory note which provided for the payment of interest only during the one-year term of the loan.

Under the terms of the purchase and sale agreement relating to the property and related assets, the Debtor required $20 million in financing to consummate the acquisition transaction.  Until several weeks before the closing, it was contemplated by parties that Jackson State would provide the entire $20 million in required financing.  Shortly before the closing date, however, the Debtor was notified by Jackson State, that the bank would be able to loan only $16.5 million of the purchase price at closing due to an issue relating to the age

---

[1]    Messrs. Cuzzupoli and Bullock were the initial investors and founders of the Debtor.  As of the time of the institution of the Chapter 11 reorganization case, memberships interests were held as follows:   Joseph Cuzzupoli (41.63%), John Bullock (31.53%), Peter Carabillo (2.51%), William Coccola (3.48%), Donald Poole, Jr. (1.35%); Donald Poole, III (1.88%), Briggs Forelli (3.6%), Leonard Lucas (3.45%), Mattson Holdings, LLC (2.51%), jco Wyoming, LLC (6.68%), Raymond Castagnola (.69%), Robert Karess (.69%).

of the bank's appraisal of the property.  In order to avoid delaying the closing until receipt of an updated appraisal, and the resultant loss of summer season income, representatives of Jackson State arranged for the seller (a long term customer of the bank) to provide the additional $3.5 million in short term subordinated financing.  On numerous occasions both prior to the closing of the transaction, and for several months thereafter, Jackson State representatives provided verbal assurances that the bank would provide the financing necessary to satisfy the Johnson Loan promptly upon the receipt of the updated appraisal. Notwithstanding such representations, following receipt of the updated appraisal in the fall of 2007[2], Jackson State, without explanation, delayed the processing and delivery of documents required to refinance the outstanding loans.  In early January, 2008, less than four months prior to the maturity of the Johnson Loan, the Debtor was informed that Jackson State had entered into an agreement to be purchased by Wells Fargo, N.A. ("Wells Fargo"), and that internal policies of Wells Fargo would preclude Jackson State from extending the amount or maturity date of the existing loan.

Although the Debtor conducted a diligent search for replacement financing, given the extremely short time available prior to the maturity date of the Johnson Loan, and the existence of the $16.5 million senior indebtedness, the Debtor was unable to locate an institutional lender willing to provide financing necessary to satisfy the Johnson Loan. Ultimately, the Debtor was forced to enter into a transaction with a private lender, JH Lending Trust ("JH Lending"), on extremely burdensome terms, including an interest rate of 15% (the "JH Loan").  The JH Loan closed in or about May, 2008.  The Debtor anticipated that the JH Loan would be short term and, in light of the value of the property,  also anticipated that it would be able to obtain a single institutional loan to satisfy the combined indebtedness of Wells Fargo and JH Trust, thereby eliminating the payment of 15% interest on the $3.5 million junior loan.  Shortly thereafter, however, the financial credit markets experienced a sharp contraction, and following the severe economic downturn during 2008, disappeared almost entirely, making a refinance of the combined loans a practical impossibility.

The Debtor's purpose with respect to the initial acquisition of the Inn was not simply to operate a hotel, but rather, to re-develop the property into a condominium/hotel facility, and transform the Inn into a facility offering superior-level accommodations.  The Debtor's property is one of a very limited number of sites in Teton Village which presented realistic redevelopment prospects at the time of the Debtor's acquisition.  Based upon the market in and around 2007 when the Debtor purchased the property, the Debtor believed that the redevelopment value of the property was in excess of $30,000,000.  In fact, after acquisition of the Inn, the Debtor expended significant funds in developing architectural plans and development plans for the property.  The severe retraction of the economy in 2008 made redevelopment a financial impossibility as credit markets no longer existed for redevelopment projects, and as the values of real property plummeted.  Thus, the Debtor was forced to shelve its redevelopment plans and operate the hotel property as currently constituted in order to

---

[2] Upon information and belief, the updated appraisal reflected a value of $33 million for the financed assets.

generate income from the asset.

## Inn Hospitality Operations

The Debtor has always utilized Metwest Terra for the operational level management of the Inn. Pursuant to the management contract between Metwest Terra and the Debtor, Metwest Terra is responsible for the daily management of the facility, including advertising, reservations, and staffing. Metwest Terra also manages the Inn's accounts payable, and makes necessary payments utilizing the Debtor's funds. The Debtor does not have any direct employees of its own – all personnel at the Inn are employees of a Metwest Terra affiliate, and the Debtor reimburses Metwest Terra pursuant to the management agreement. The Debtor oversees the services provided by Metwest Terra, and makes over-arching macro-level decisions with respect to the Inn operations, such as establishing an annual budget for operations, negotiation of management agreements, and determination of policy matters. Metwest Terra maintains books and records with respect to the Inn operations, and the Debtor maintains separate records with respect to LLC-level operations.

As a vacation resort facility, the Inn experiences two busy seasons each year. Perhaps obvious is that, as a mountainside facility located at the Jackson Hole Ski Resort, the Inn has an active winter ski season which generally runs from Christmas through March of each winter. Somewhat less intuitive is the fact that the most profitable period for the Inn's operations is during the summer months. The Inn's proximity to Grand Teton National Park (1 mile) and Yellowstone National Park (less than one hour drive) is reflected in higher occupancy rates during the summer vacation months. The intervening off-peak months are significantly less busy, and the Inn does not accept bookings for the month of November and for a two-week period in April.

Attached as Exhibit B is a chart of historical revenues realized by the Inn during the time of the Debtor's ownership.

## Events Leading To Chapter 11 Filing

As noted previously, the decline in economic conditions in 2008 generally, together with the virtual non-existence of credit markets and precipitous decline in real estate values, made refinancing the subordinate mortgage on the Inn exceptionally expensive. The monthly amount necessary for debt service related to the second mortgage increased from $26,250,per month required for the Johnson Loan to $43,750 per month required for the JH Loan. Moreover, the first mortgage loan then held by Wells Fargo (the "Wells Fargo Loan") was to mature on or about May 9, 2009. Despite several months of attempted negotiations with Wells Fargo for a requested extension of the Wells Fargo Loan maturity date, all such negotiations failed, and the loan matured without satisfaction. Post-maturity, the Wells Fargo Loan accrued interest at a much higher default rate of interest. During 2009, the Debtor

became unable to fund the debt service in connection with both the Wells Fargo Loan and the JH Loan.  When negotiations for reinstatement and extension of the Wells Fargo Loan failed, Wells Fargo scheduled a foreclosure sale of the Inn for October 12, 2010.  The Debtor filed its Chapter 11 petition on October 11, 2010 (the "Petition Date") to enjoin the foreclosure sale and to preserve the value of the Debtor's assets in conjunction with a restructuring of its indebtedness.

### III.  POST-PETITION ACTIVITIES AND OPERATIONS

#### A.  Cash Collateral

The Debtor filed a number of so-called "First Day Motions" upon the initial filing of its Chapter 11 petition, including an emergency request for authorization for the use of cash collateral.  As of the Petition Date, the two parties asserted security interests in the Debtor's assets, including cash, rents and revenues received from hotel operations ("cash collateral"), Wells Fargo and JH Lending.  Pursuant to Section 363 of the Bankruptcy Code, a debtor may not use cash collateral without either the consent of the parties holding an interest therein, or pursuant to an Order of the Court authorizing such use.  A party holding a valid interest in cash collateral is entitled to protection of such interest against diminution in value as provided in the Bankruptcy Code.

As of the Petition Date, the Debtor had approximately $30,000 on hand which could be characterized as cash collateral.  Pursuant to its motion seeking authorization to use cash collateral, the Debtor requested the use of all funds generated pre-petition and post-petition for the continued operation of the Inn.  At the time, the Debtor projected that cash on hand, after payment of post-petition Inn operating expenses (exclusive of professional fees), would increase to $155,000 by January, 16, 2011.  Thus, the Debtor contended that the alleged interest of Wells Fargo in cash collateral was adequately protected, and would be enhanced by on-going operations.

The Court first granted relief in connection with the Cash Collateral Motion on an emergency interim basis pursuant to a stipulation filed jointly by the Debtor and Wells Fargo at an initial hearing on this matter conducted by the Court on October 15, 2010.  Wells Fargo thereafter filed its *Objection Of Wells Fargo Bank, N.A. To Motion Of The Debtor-In-Possession For Authority To Use Cash Collateral* (the "Objection") on November 3, 2010.  The Court conducted further hearings with respect to the Cash Collateral Motion on November 4, 2010 and November 15, 2010.  At the hearing conducted on November 15, 2010, the parties informed the Court that there existed no agreement with respect to the continued use of cash collateral, and, thereupon, the Court scheduled an evidentiary hearing relating to the Cash Collateral Motion and the Objection.  The Court conducted an evidentiary hearing with respect to the Cash Collateral Motion and the Objection which commenced on November 29, 2010 and which concluded on November 30, 2010 (the "Evidentiary Hearing").

At the Evidentiary Hearing, the Debtor was accorded the opportunity to present such evidence and argument as it believed appropriate in support of the relief requested in the Cash Collateral Motion, and Wells Fargo was accorded the opportunity to cross-examine witnesses presented by the Debtor and to present such additional evidence which it believed appropriate in support of the Objection.

At the conclusion of the aforesaid hearing on November 30, 2010, the Court made various findings of fact and rulings of law on the record, including: (i) that the evidence presented by the Debtor supported its contention that the Debtor's cash position would improve during the post-petition period through February 27, 2011 as then forecast by the Debtor and as reflected in the revised operating budget submitted during the course of the evidentiary hearing; and (ii) based upon the evidence presented by the Debtor, including testimony regarding the bases of the projections reflected in the proposed operating budget and the Debtor's post-petition operating results, the Court found it more likely than not that the Debtor would be able to achieve the projections forecast in the proposed budget.

In light of its findings, the Court ruled that the interest of Wells Fargo in its asserted cash collateral was adequately protected by the continuing security interest in the Debtor's post-petition cash receipts. The Court authorized the Debtor to use cash collateral in accordance with the submitted budget and granted to Wells Fargo and JH Lending post-petition security interests (the "Adequate Protection Liens") in the same types of post-petition property of the estate (the "Post-Petition Collateral") against which Wells Fargo and JH Lending held liens as of the Petition Date (the "Pre-Petition Collateral"). The Adequate Protection Liens maintain the same priority, validity and enforceability as the pre-petition liens of Wells Fargo and JH Lending. The Adequate Protection Liens are to be recognized, however, only to the extent of any diminution in value of the interest of Wells Fargo or JH Lending in cash collateral after the Petition Date resulting from the Debtor's use of the cash collateral during this Chapter 11 case. Additionally, the Court imposed certain weekly financial reporting requirements which required the Debtor to provide weekly reports to Wells Fargo and the United States Trustee detailing the cash receipts for the prior week, the Debtor's actual performance for the week compared to budget projections, and a schedule of all outstanding checks or payments issued by the Debtor identifying the line item within the budget to which they relate.

On January 24, 2011, at the request of the Debtor, and with the assent of Wells Fargo, the Court entered an Order granting the relief requested in the Debtor's *Assented To Motion For Order Concerning Revision Of Cash Collateral Operating Budget* (the "Budget Revision Motion")*,* which allowed for the revision of the Operating Budget (the revised budget projections referred to as the "January Revised Budget"), and which augmented the Debtor's weekly reporting requirements.

In advance of the expiration of the previously authorized period for use of cash collateral, the Debtor and Wells Fargo reviewed relevant information regarding the Debtor's post-petition operations, including the Debtor's newly-prepared draft cash flow projections through September 2011, and agreed upon the terms of the Debtor's continued use of cash collateral through April 30, 2011. In connection with such agreement, the Debtor and Wells Fargo jointly participated in the formulation of an agreed order which was submitted to the Court and which provided for continued use of cash collateral through April 28, 2011, and which also provided for the payment to Wells Fargo of $40,000 on March 1, 2011 and $40,000 on April 1, 2011 as additional adequate protection of its alleged interest in cash and non-cash collateral.

On April 28, 2011, the Debtor and Wells Fargo filed an additional agreed order concerning the further use of cash collateral which similarly provided for the continuation of the Adequate Protection Liens, restricted operation in accordance with an agreed budget, and provided for further adequate protection payments to Wells Fargo. The agreed order allows for continued use of cash collateral in accordance with a proposed budget through the next scheduled hearing on September 1, 2011, provided that the Debtor file a plan and disclosure statement on or before July 1, 2011, and provided further that the Debtor make additional adequate protection payments to Wells Fargo in the amount of $50,000 on May 1, 2011 and June 1, 2011, and $60,000 on each of July 1, 2011 and August 1, 2011. The Debtor is in compliance with the terms of the April 28 agreed order.

### B.  Post-Petition Operating Results

Metwest Terra has continued to provide management services post-petition pursuant to its management contract. All debtor-in-possession bank accounts are maintained by Metwest Terra on the Debtor's behalf and in the name of the Debtor.

Since the Petition Date, the Debtor has operated on a cash flow positive basis and has paid all of its post-petition operating expenses other than debt service on the alleged secured debt, and professional fees. The Debtor has generated gross revenue since the Petition Date through June 24, 2011 in the amount of $1,681,973, has paid operating expenses of the Inn in the aggregate amount of $1,413,977, including adequate protection payments to Wells Fargo in the aggregate amount of $200,000, and has cash on hand of approximately $298,646. As of July 1, 2011, the Debtor is slightly behind its current revenue projections, however, the Debtor attributes the lag to a delay in the pace of vacation reservation bookings in this uncertain economy. The Debtor is very confident that it will attain its projected bookings, albeit slightly slower rate than previously projected.

Attached hereto as Exhibit C is a cash flow statement reflecting the Debtor's post-petition operations through June 24, 2011.

C.          **Establishment of Bar Date.**

At the Debtor's request, the Court established June 24, 2011 as the Claims Bar Date. This Claims Bar Date applies to all Claims, except for: (a) Creditors with Administrative Claims, (b) Chapter 11 Professionals, and (c) Creditors holding Claims resulting from the Debtor's post-Bar Date rejection of unexpired leases or Executory Contracts. Unsecured Creditors whose claims are listed in the Schedules as undisputed, liquidated and noncontingent will be entitled to participate in distributions under the Plan notwithstanding their failure to have filed a Claim by the Claims Bar Date.

## IV.      STATEMENT OF ASSETS AND LIABILITIES.

The Debtor's primary asset is the Inn, which consists of a four-story 43,000 square foot resort hotel facility offering 83 guest rooms located on approximately .98 acres in Teton Village.  The facility is a wood-frame structure with exterior corridors and exterior guest room entrances.  The Inn contains meeting facilities, an outdoor pool, and a 5,000 square foot restaurant.  The hotel structure initially opened for operation in or about 1972.  The Debtor believes that the Inn has a fair market value of $9,500,000.

As of the Petition Date, the Inn was encumbered by mortgages held by Wells Fargo and JH Lending.  Wells Fargo asserts that as of the Petition Date, the amount due to it which was secured by the mortgage against the Inn was $17,783,019.99.  JH Lending alleges that the amount of $3,414,999.60 was outstanding as of the Petition Date and secured by its mortgage against the Inn[3].

The Debtor has unpaid pre-petition hotel sales taxes due to the State of Wyoming in the approximate amount of $54,000.  The Debtor's scheduled unsecured pre-petition debt aggregates approximately $303,000, comprised of unsecured trade debt that was unpaid as of the filing date, and unsecured loans to the Debtor.

## V.       DESCRIPTION OF THE PLAN.

The following is a summary of certain significant provisions of the Plan. This summary is qualified in its entirety by reference to the more detailed information set forth in the Plan. This Disclosure Statement, together with the Plan, which is attached hereto as Exhibit A, should be read completely. The Plan, if confirmed, will be binding upon the Debtor, its creditors and the holders of equity Interests.

---

[3]   In addition to the referenced mortgage interests in the Debtor's property, the Wells Fargo Loan is supported by limited guarantees of Joseph Cuzzpoli and John Bullock.  The JH Loan is supported by collateralized guarantees of Messrs. Cuzzpoli and Bullock and their respective spouses.

### A. No Classification of Administrative Claims and Priority Tax Claims.

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for purposes of voting on, or receiving distributions under, the Plan. All such Claims shall be treated separately as unclassified Claims on the terms set forth herein.

### B.    Administrative Claims

On the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim shall be paid in full in Cash for the unpaid portion of such Allowed Administrative Claim, in full, final, and complete satisfaction of such Claim; provided that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

All requests for payment of an Administrative Claim must be filed with the Court and served upon counsel to the Debtor or the Reorganized Debtor, as applicable, on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim that is not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Reorganized Debtor without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court or other Entity. With the exception of Professional Fee Claims which must be Allowed by the Bankruptcy Court, the Reorganized Debtor may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Professional Claims are estimated by the Debtor to total $150,000.00.

### C.    Priority Tax Claims

On the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, in full, final, and complete satisfaction of such Claim, one of the following to be determined in the sole discretion of the Debtor, or the Reorganized Debtor, as applicable: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an

amount agreed to by the Debtor or the Reorganized Debtor, as applicable, and such Holder; provided that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; (3) in the sole discretion of the Debtor or the Reorganized Debtor, as applicable, and in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; or (4) such other treatment as the Debtor or the Reorganized Debtor, as applicable, and the Holder of a Priority Tax Claim may otherwise agree. Priority Tax Claims asserted against the Debtor are estimated to total approximately $54,000.00.

**D. Classification and Treatment of Claims and Interests That Are Classified.**

All Claims and Interests against the Debtor except Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest against the Debtor, as applicable, is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest against the Debtor in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

For purposes of voting, distributions, and all confirmation matters, except as otherwise provided herein and in accordance with Bankruptcy Code Section 1122, all Allowed Claims and Interests shall be classified and treated as follows:

1.   Class 1 -Wells Fargo's Secured Claim against the Debtor.

    a.    Classification: Class 1 consists of the Secured Claim against the Debtor in the approximate amount of $9,000,000.00 currently held by Wells Fargo under the Wells Fargo Loan Documents, the amount of which Secured Claim is equal to the market value of that portion of the Inn in which Wells Fargo holds a first priority lien.

    b.    Treatment:  The Holder of the Allowed Class 1 Claim shall receive the following treatment under the Plan:

    (i)    The Wells Fargo Pre-Petition Note shall be deemed canceled and the Wells Fargo Reorganization Note shall be delivered to the Holder of the Class 1 Claim and shall replace and supercede in all respects the Wells Fargo Pre-Petition Note. A copy of the proposed Wells Fargo Reorganization Note is attached hereto as Exhibit A to the Plan. The

Wells Fargo Reorganization Note shall include the following terms:

   (ii) The Wells Fargo Reorganization Note shall be a full recourse secured term promissory note in the stated amount of nine ($9,000,000.00) million dollars. The Wells Fargo Reorganization Note shall have a seven (7) year term with payments of interest only for the first two years. Interest will be paid in arrears. The Debtor shall commence making payments under the Wells Fargo Reorganization Note on the first day of the first full month following the Effective Date (the "Payment Commencement Date") and continuing of the same day of each consecutive month thereafter through the Maturity Date as defined below. Commencing on the Effective Date, interest shall accrue on the outstanding principal balance owed under the Wells Fargo Reorganization Note at a per annum rate equal to Wells Fargo's ninety (90) day LIBOR Rate in effect on such date plus five percent (5.00%). The interest rate will then be adjusted on the Payment Commencement Date and on the first day of each month thereafter, (the "Interest Rate Change Date(s)"). On each such Interest Rate Change Date, the interest rate shall be adjusted to a fixed interest rate for the succeeding month, which interest rate is equal to Wells Fargo's ninety day (90) LIBOR Rate as of the Interest Rate Change Date then applicable plus five percent (5.00%). Interest on this Note shall be computed on a 365/360 simple interest basis; that is, interest is computed by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. As used herein, Wells Fargo's ninety (90) day LIBOR Rate shall mean the one month rate quoted for the London Interbank Offered Rate as published in the Wall Street Journal for the applicable Interest Rate Change Date. This definition of Wells Fargo's ninety (90) day LIBOR Rate is to be strictly interpreted and is not intended to serve any purpose other than providing an index to determine the interest rate used herein. Principal payments shall commence on the second anniversary of the Payment Commencement Date and principal shall be amortized on a twenty-five (25) year amortization basis such that monthly principal payments commencing on the second anniversary of the Payment Commencement Date shall be in the amount of $30,000.00. On the seven year anniversary of the Effective Date (the "Maturity Date"), the Reorganized Debtor shall pay to the Holder of the Wells Fargo Reorganization Note the entire then unpaid balance of principal and interest owed under the Wells Fargo Reorganization Note.

   (iii) The Wells Fargo Reorganization Note shall be secured from and after the Effective Date by the Wells Fargo Pre-Petition Mortgage, as amended by the Plan, on the Inn such that Wells Fargo shall retain its first mortgage Lien on the Inn. All references in the Wells Fargo Pre-Petition Mortgage to the Wells Fargo Pre-Petition Note shall hereafter be deemed to be references to the Wells Fargo Reorganization Note. The Wells Fargo Pre-Petition Mortgage shall be deemed amended in accordance with Exhibit B attached to the Plan.

   (iv) All references in the Wells Fargo Pre-Petition Loan Agreement to the Wells Fargo Pre-Petition Note shall hereafter be deemed to be references to the Wells Fargo

Reorganization Note. The Wells Fargo Pre-Petition Loan Agreement shall be deemed amended in accordance with Exhibit C attached to the Plan.

(v)    All pre-Effective Date defaults under the Wells Fargo Loan Documents shall be deemed cured or waived by this Plan. The Wells Fargo Reorganization Note may be pre-paid at any time without penalty. If the Debtor fails to cure any default under the Wells Fargo Reorganization Note within ten (10) days after written notice of such default is given to the Debtor by the Holder of the Wells Fargo Reorganization Note, said Holder shall be authorized to immediately accelerate the Wells Fargo Reorganization Note and to exercise all rights and remedies available under the Wells Fargo Reorganization Note and the Wells Fargo Loan Documents as modified by the Plan and/or under applicable law. As the Wells Fargo Claim is undersecured, no interest, default rate interest, late fees or other charges shall have accrued under the Wells Fargo Loan Documents from and after the Petition Date. No default rate interest, late fees or other charges shall accrue under the Wells Fargo Reorganization Note as a result of any default or event of default that occurred or existed under the Wells Fargo Loan Documents prior to the Effective Date. The liens securing the Allowed Class 1 Secured Claim shall be extinguished upon payment in full of the Allowed Class 1 Secured Claim in accordance with this Plan, and the holder of the Allowed Class 1 Secured Claim shall promptly file or record notice of the release of its liens. All other terms and conditions of the Wells Fargo Loan Documents will remain unchanged except as modified by the Plan and/or the Confirmation Order.

(vi)    All amounts due and owing under the Wells Fargo Loan Documents that are not treated as an Allowed Class 1 Secured Claim will be classified and treated as a Class 2 Wells Fargo Unsecured Claim.

(vii)    The Class 1 Claim is Impaired under the Plan and the Holder of the Class 1 Secured Claim will, therefore, be entitled to vote to accept or reject the Plan.

2.    Class 2 -Wells Fargo's Unsecured Claim against the Debtor

a.    Classification:  Class 2 consists of the Unsecured Claim currently held by Wells Fargo against the Debtor in the approximate amount of $8,750,000.00.

b.    Treatment: The Holder of the Allowed Class 2 Unsecured Claim shall receive the following treatment under the Plan:

(i)    The Holder of the Allowed Class 2 Unsecured Claim shall receive a pro rata share, together with the Holders of Allowed Class 3 Unsecured Claims, of the Unsecured Claim Distribution Fund in the amount of $623,000.00. Such pro rata share will be paid in full on the Distribution Date. Such pro rata share may increase in the event that JH Lending Trust waives either the JH Lending Trust Claim against the Debtor or JH Lending Trust's right to receive a distribution under the Plan on the JH Lending Trust Claim.

(ii)    The Class 2 Unsecured Claim is Impaired under the Plan and the Holder of the Class 2 Unsecured Claim will, therefore, be entitled to vote to accept or reject the Plan.

3.    Class 3- Unsecured Claims against the Debtor Exclusive of Wells Fargo's Unsecured Claim.

a.    Classification:  Class 3 consists of all Unsecured Claims against the Debtor including, without limitation, Rejection Damages Claims in an as yet undetermined amount, the JH Lending Trust Claim in the approximate amount of $3,415,000.00, trade creditor and other Unsecured Claims in the approximate total amount of $303,000.00, but exclusive of the Class 2 Unsecured Claim in the approximate amount of $8,750,000.00. Class 3 Unsecured Claims total approximately $3,718,000.00.

b.    Treatment:  Treatment:  The Holders of Allowed Class 3 Unsecured Claims shall receive the following treatment under the Plan:

(i)    The Holders of Allowed Class 3 Unsecured Claims shall receive a pro rata share together with the Holder of the Allowed Class 2 Unsecured Claim of the Unsecured Claim Distribution Fund in the amount of $623,000.00. Such pro rata share will be paid in full on the Distribution Date. Such pro rata share paid to Holders of Class 3 Unsecured Claims other than JH Lending Trust may increase in the event that JH Lending Trust waives either the JH Lending Trust Claim against the Debtor or JH Lending Trust's right to receive a distribution under the Plan on the JH Lending Trust Claim.

(ii)    Pursuant to the Plan, JH Lending Trust may agree to waive the JH Lending Trust Claim against the Debtor or any distribution under the Plan on its JH Lending Trust Claim. In such event, the distributions to the Holders of Class 3 Unsecured Claims (other than JH Lending Trust) and to the Holder of the Class 2 Unsecured Claim shall be increased proportionally by the pro rata share from the Unsecured Claim Distribution Fund which JH Lending Trust would otherwise have been received had it not waived its JH Lending Trust Claim or any distribution under the Plan on such Claim.

(iii)    Class 3 Claims are Impaired under the Plan and the Holders of Class 3 Unsecured Claims will, therefore, be entitled to vote to accept or reject the Plan.

4.    Class 4 - Holders of Interests in the Debtor

a.    Classification:  Class 4 consists of all Interests in the Debtor.

b.    Treatment: The Holders of the Class 4 Interests shall receive the following treatment under the Plan:

(i)     On the Effective Date, all Interests in the Debtor shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. No property shall be retained by or distributed to the Holders of Interests under the Plan.

(ii)     Holders of Class 4 Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 4 Interests will not be entitled to vote to accept or reject the Plan.

### F.   Provisions For Implementation Of Plan

1.     <u>Acceptance by Impaired Classes of Claims</u>:  Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

2.     <u>Elimination of Vacant Classes</u>:  Any Class of Claims that has no Holders of any Allowed Claims or any Claims temporarily Allowed under Bankruptcy Rule 3018 due to no ballots having been cast in such Class entitled to vote on the Plan shall be deemed eliminated from the Plan for purposes of voting and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

3.     <u>Tabulation of Ballots</u>:  The Debtor will tabulate all votes on the Plan for the purpose of determining whether the Plan satisfies Sections 1129(a)(8) and (10) of the Bankruptcy Code.

4.     <u>Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code</u>:  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtor and Molokai shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### G.   Means of Implementation

### Operations Through and After the Effective Date

During the period through and until the Effective Date, the Debtor shall continue to operate its business as a debtor in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, all orders of the Bankruptcy

Court that are then in full force and effect, and as set forth herein. The automatic stay of Section 362 of the Code shall continue in effect through the Effective Date. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Both before and after the Effective Date, the Debtor and Reorganized Debtor, respectively, shall be authorized to continue to use their cash on hand in the operation of their business.

**Cancellation of Existing Membership Interests, Issuance of New Membership Interests and Funding of Plan Payments**

On the Effective Date and in accordance with a Plan Funding Agreement attached to the Plan, Molokai or its nominee will make available to fund payments under the Plan or as working capital the sum of $1,000,000.00. All existing Interests shall be deemed cancelled as of the day immediately prior to the Effective Date. On the Effective Date, the New Membership Interests shall be issued to Molokai or its nominee and Molokai or its nominee shall designate a new Managing Member of the Debtor. On and after the Effective Date, Molokai or its nominee shall hold all of the membership interests in the Reorganized Debtor. The $1,000,000.00 in funds made available by Molokai or its nominee shall be used as follows: (i) $623,000.00 will be used to fund the Unsecured Claim Distribution Fund; (ii) $150,000.00 will be used to fund a separate reserve fund (the "Reserve Fund") to be used to pay Allowed Administrative Claims to the extent necessary in the event that the Debtor or the Reorganized Debtor have insufficient funds on hand to pay such Claims; (iii) $227,000.00 will be made available to the New Managing Member for working capital needs of the Reorganized Debtor including to pay Priority Tax Claims, day to day operating expenses and capital improvements to the Inn. In the event that any portion of the Reserve Fund is not used to pay Allowed Administrative Claims, such excess may be used by the Debtor or the Reorganized Debtor for working capital needs of the Reorganized Debtor including to pay Priority Tax Claims, day to day operating expenses and capital improvements to the Inn.

On the Distribution Date, in accordance with the Plan, the Reorganized Debtor will use the $623,000.00 in the Unsecured Claim Distribution Fund to pay pro rata Distributions to Holders of Allowed Class 2 and Allowed Class 3 Unsecured Claims (exclusive of the JH Lending Trust Claim if such Claim or any distribution on such Claim has been waived by JH Lending Trust).

The $150,000.00 Reserve Fund shall be available for the Reorganized Debtor to pay Allowed Administrative Claims to the extent that such Allowed Administrative Claims have not been paid with cash on hand held by the Reorganized Debtor.

**Settlement Between the Debtor and JH Lending Trust.**

Prior to the Confirmation Date, the Debtor shall attempt to reach a settlement with JH Lending Trust and Cuzzupoli under which JH Lending Trust shall have waive and release the JH Lending Trust Claim against the Debtor and any right to a distribution under the Plan including as the Holder of a Class 3 Unsecured Claim. Pursuant to said settlement, Cuzzupoli shall have assumed full and primary liability for repayment of the JH Lending Trust Claim and the Debtor shall have been relieved from all liability for the JH Lending Trust Claim.

**Settlement between the Debtor and Cuzzupoli.**

Prior to the Confirmation Date, and provided that the settlement described in paragraph D of this Article IV between JH Lending Trust, the Debtor and Cuzzupoli has been entered into and is in full force and effect, the Debtor and the Reorganized Debtor shall waive and release any and all Causes of Action held by them against Cuzzupoli including, without limitation, any Causes of Action against Cuzzupoli for return of Pre-Petiton transfers of property of the Debtor and Cuzzupoli shall waive and release the Debtor and the Reorganized Debtor from any and all Causes of Action including any Cuzzupoli Claim which he holds against the Debtor and the Reorganized Debtor.

**New Note**

On the Effective Date, the Reorganized Debtor will enter into the Wells Fargo Reorganization Note which note shall be valid, binding, and enforceable in accordance with its terms and shall be delivered to the Holder of the Allowed Class 1 Secured Claim. The Wells Fargo Reorganization Note shall continue to be secured by a first mortgage Lien on the Inn as amended by the Plan. The Wells Fargo Reorganization Note shall replace and supersede in all respects the Wells Fargo Pre-Petition Note which shall be deemed canceled.

**Second Amended and Restated Operating Agreement**

Pursuant to the Plan, the Reorganized Debtor will amend and restate its current Amended and Restated Operating Agreement dated June 2008 as required by Molokai or its nominee in its sole discretion. From and after the Effective Date of the Plan, Molokai or its nominee shall be issued and shall hold all of the Membership Interests in the Reorganized Debtor. The Reorganized Debtor will be permitted to engage in any lawful act or activity for which limited liability companies may be organized under Wyoming law and will have perpetual existence. A copy of the proposed Second Amended and Restated Operating Agreement is annexed to the Plan as Exhibit E. The business and affairs of the Reorganized Debtor will be managed by or under the direction of the new managing member of the Reorganized Debtor selected by Molokai or its nominee.  Any and all debt forgiveness income arising from any transactions under the Plan shall be allocated to the holders of

Interests and no such debt forgiveness income shall be allocated to Molokai, its nominee or any other holder of the New Membership Interests or the New Managing Member. Holders of existing Interests cancelled under the Plan shall receive K-1s in the ordinary course showing their COD income, if any.

### Vesting of Assets in the Reorganized Debtor

Except for the security interests and Liens of the Holder of the Class 1 Secured Claim, (which security interests and Liens shall be retained by the Holder thereof) or as otherwise expressly provided in the Plan, on the Effective Date, all property in the Debtor's Estate, all Causes of Action not previously waived, released or settled in writing, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, Interests or other encumbrances.

### Automatic Action

Each of the matters provided for by the Plan involving the limited liability company structure of the Reorganized Debtor or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, the managers, managing members or Holders of membership interests of the Debtor. Without limiting the foregoing, such actions may include the adoption, approval and filing of the Second Amended and Restated Operating Agreement.

### Effectuating Documents and Further Transactions

On and after the Effective Date, the Reorganized Debtor, and its manager or managing member, are authorized to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity except for those expressly required pursuant to the Plan, including, but not limited to, the following: (1) issuance, execution, delivery, filing, or recording such contracts, securities, instruments, releases, notes and other agreements or documents as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (2) execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (3) execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty, or obligation necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan; (4) the filing of appropriate certificates of organization or reorganization with the appropriate governmental authorities pursuant to applicable law; and (5) all other actions that

the Reorganized Debtor determines are necessary or appropriate.

### Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any Entity in accordance with, in contemplation of, in connection with the Plan, or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, or other Interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### Preservation of Rights of Action

Except Causes of Action that are expressly settled, waived or released under the Plan, the Reorganized Debtor may pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Disclosure Statement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Except as otherwise provided herein, the Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Confirmation Order to any Cause of Action against them as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtor expressly reserves all Causes of Action for later prosecution and adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of, the Confirmation or the Consummation of the Plan. The Debtor or the Reorganized Debtor, as applicable, shall have the exclusive right, authority, and discretion, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or

litigate to judgment any such Causes of Action and to decline to do any of the foregoing without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## VI . CONFIRMATION PROCEDURES

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Solicitation Of Votes.

As required by the Bankruptcy Code, the Debtor is soliciting acceptance of all classes of Claimants which are "impaired" under the Plan. Classes 1, 2 and 3 are impaired under the Plan.

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of two-thirds in dollar amount and more than one-half in number of the claims of that class who actually cast ballots for acceptance or rejection of the plan, that is, acceptance occurs only if two-thirds in amount and one-half in number of the claims voting cast their ballots in favor of acceptance. A Claimant's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the Claimant's acceptance or rejection was not solicited or procured in good faith or in accordance with the provision of the Bankruptcy Code. Any creditor of an impaired class (a) whose claim has been scheduled by the Debtor in the schedules filed with the Bankruptcy Court (provided that such claim has not been scheduled as disputed, contingent or unliquidated), or (b) who has filed a proof of claim unless such claim has been disallowed for voting purposes by the Bankruptcy Court, is entitled to vote.

### B.    Confirmation Hearing.

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan at which any party in interest may object to confirmation.  The hearing on confirmation of the Plan has been scheduled for _____. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except by announcement made at the hearing. Any objection to confirmation must be made in writing and filed with the Bankruptcy Court and served upon the persons identified below on or before _____.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Counsel to Debtor:                          Counsel to Molokai Partners, LLC:

Donald F. Farrell, Jr.                      James M. Liston
Anderson Aquino LLP                         Bartlett Hackett Feinberg PC
240 Lewis Wharf                             155 Federal Street
Boston, MA  02110                           Boston, MA  02110


**C.      Confirmation**.

At the hearing on confirmation of the Plan, the Bankruptcy Court shall confirm the
Plan only if the Plan meets the requirements of Section 1129 of the Bankruptcy Code. Section
1129 includes several requirements for confirmation of a plan. The more significant
requirements are discussed as follows:

**1. Best Interest Test.**

Before the Bankruptcy Court will confirm the Plan, the Plan must meet the so-called
best interest test. The best interest test requires that with respect to each impaired class of
creditors under the Plan, each Claimant either (a) has accepted the Plan; or (b) will receive or
retain under the Plan on account of its claim property of a value, as of the effective date of the
Plan, that is not less than the amount such Claimant would receive or retain if the Debtor was
liquidated under chapter 7 of the Bankruptcy Code. In other words, if one or more Claimants
that are members of an impaired class vote to reject the Plan, the Court will confirm the Plan
only if the distribution to such Claimants under the Plan is not less than the distribution that
the Claimants would receive under a Chapter 7 liquidation of the Debtor.

Based upon several factors present in the Debtor's bankruptcy case, the Debtor
believes that the Plan meets the best interest test. Considering the liquidation value of the
Debtor's assets, the cost of liquidation under Chapter 7, and the adverse impact that a
liquidation under Chapter 7 would have on the Debtor's going concern value, the Debtor
believes that the Plan provides for a larger distribution to individual unsecured creditors than
under a Chapter 7 liquidation of the Debtor.

The liquidation analysis of the Debtor's tangible assets is more particularly described
In Exhibit D attached hereto. In summary, a straight liquidation of the Debtor's tangible assets
would likely result in a distribution to unsecured creditors of $251,750. The Debtor believes
that its tangible assets are more valuable to its unsecured creditors as part of a going concern
that will generate sufficient income to fund the Plan. Under the Plan, the Debtor will pay
unsecured creditors a pro rata share of the $623,000 Unsecured Claim Distribution Fund.
Thus, the funds available to unsecured creditors will be greater pursuant to the Plan than
would result from a liquidation of the Debtor's tangible assets.

In addition, the Debtor's cost of liquidation under Chapter 7 would include fees payable to a trustee in bankruptcy, fees that might be incurred by additional attorneys, and other professionals that a Chapter 7 trustee might engage. The cost of liquidation also would include any expenses of an auctioneer that are allowed in the Chapter 7 case. The foregoing types of claims and such other claims that may arise in the liquidation, or that would result from the pending reorganization, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 unsecured claims. The liquidation of the Debtor's estate under Chapter 7 would create costs and expenses greatly in excess of the costs and expenses of reorganization that would be paid under the Plan. In essence, any bankruptcy trustee appointed under Chapter 7 of the Bankruptcy Code would have to recommence the administration of the Debtor's estate and would incur considerable expense covering the same ground and duplicating the efforts of the Debtor and the professionals the Debtor has hired during the pendency of the Debtor's reorganization. Accordingly, the Debtor believes that a liquidation of the Debtor under Chapter 7 adversely would affect all unsecured creditors by lowering the amounts available for distribution to unsecured creditors after payment of administrative and other priority claims.

To determine if the Plan is in the best interest of each impaired class, the Bankruptcy Court will compare the present value of the distributions from the proceeds of the liquidation of the Debtor's assets and properties (after subtracting the amounts attributable to the claims discussed above) with the present value offered to each of the classes of unsecured claims under the Plan. Unless it specifically determines otherwise, the Bankruptcy Court will treat all pre-chapter 11 general unsecured claims, which would have the same rights upon liquidation, as one class for the purposes of determining the potential distribution of the liquidation proceeds pro rata according to the amount of the claim held by each creditor.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the present case, including the costs and expenses of liquidation under Chapter 7, the uncertainties inherent in a Chapter 7, and the adverse affect that a Chapter 7 would have on the value of certain of the Debtor's assets, the Debtor has determined that a Chapter 7 liquidation would, at best, yield payments to unsecured creditors in an amount much less than the payments provided for in the Plan. In addition, the Debtor believes that the value of any distributions from the liquidation proceeds in a Chapter 7 would be less than the value of the distributions under the Plan because such distribution in a chapter 7 would not occur for a substantial period of time. A distribution of the proceeds of a liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve disputed claims and prepare for distributions. If litigation were necessary to resolve certain claims, which is likely, the delay could be prolonged.

Based on the foregoing analysis and given the elimination of uncertainties inherent under Chapter 7, the Debtor believes the confirmation of the Plan will provide each Claimant with greater recovery than such Claimant would receive pursuant to a liquidation of the

Debtor under Chapter 7 of the Bankruptcy Code. In support of the Debtor's belief that if the Debtor's bankruptcy case were converted to a Chapter 7 the resulting distribution to unsecured creditors would be lower than the distributions provided by the Plan, the Debtor refers to the discussion in Exhibit D.

### 2. Acceptance.

Each impaired class of Claimants must accept the Plan, or the "Fair and Equitable Test" described below, must be met with respect to each impaired Class that does not accept the Plan by the requisite vote.

### 3. Fair and Equitable Test.

In the event any impaired class of Claimants does not accept the Plan, the Debtor must demonstrate to the Bankruptcy Court, as to each nonaccepting class, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that class. A Plan does not discriminate unfairly if no class receives more than it is entitled to for its claims or interests. The Bankruptcy Code establishes "fair and equitable" tests for unsecured creditors as follows:

Unsecured Creditors: Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting Class will not receive any property under the Plan.

The Debtor may seek confirmation of the Plan even if the Plan is not accepted by a class of creditors.

### 4. Feasibility.

The Debtor believes that the Plan is feasible and will request that the Court make a finding that the Plan is feasible.  As stated above in Section V, the Debtor anticipates that cash in the approximate aggregate amount of $773,000 will be necessary on the Effective Date for distribution of dividends payable to allowed unsecured claims from the Unsecured Claim Distribution Fund and for payment of allowed administrative expenses.  On the Effective Date, the Debtor/Reorganized Debtor will have available (i) $623,000 in the Unsecured Claim Distribution Fund, (ii) $150,000 in the Reserve Fund, (iii) $227,000 of additional funds advanced by Molokai, and projected cash from operations of approximately $_____.  Thus, the Debtor believes that the Reorganized Debtor will have sufficient cash available as of the Effective Date to make the payments then required pursuant to the Plan.

The second consideration in determining feasibility of the Plan is consideration of the

Reorganized Debtor's ability to make the payments required pursuant to the Wells Fargo Reorganization Note.  Attached hereto as Exhibit E is a five-year cash flow projection prepared for the Debtor by Metwest Terra which reflects the Reorganized Debtor's anticipated revenues and expenses (the "Five year Proforma").  The Five Year Proforma reflects that the Reorganized Debtor will have sufficient funds available from operations to make the required payments pursuant to the Wells Fargo Reorganization Note.

In light of the foregoing, the Debtor believes that the Plan is feasible, and that the Reorganized Debtor can successfully make the payments required pursuant to the Plan.

**5. Consummation.**

The Plan will be consummated and the distributions made if the Plan is confirmed. The Plan is to be implemented pursuant to the provisions of the Bankruptcy Code. Implementation requires and order of the Bankruptcy Court confirming the Plan. The Debtor reserves the right to submit a plan for confirmation pursuant to 11 U.S.C. §1129(b).

## VII.  ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed and consummated, the theoretical alternatives include (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, (b) the dismissal of this case, or (c) the Debtor or any other party in interest could attempt to formulate a different plan. Such a plan might involve a different method of calculating the distribution to creditors. The Debtor believes that the Plan as described herein enables creditors to realize the most under the circumstances. The Debtor believes that a liquidation under Chapter 11 is a much more attractive alternative to creditors other than a Chapter 7 liquidation because a greater return to creditors will be obtained.

## VIII.  TAX CONSEQUENCES

Substantial uncertainties exist with respect to any tax consequences of the Plan to any particular holder of a Claim or Interest. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. Therefore, each holder is strongly urged to consult his, her, or its own tax adviser regarding the United States federal, state, and local and any foreign tax consequences of the transactions described in the Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to Debtor or any holder of Claims or Interests.

In accordance with IRS Circular 230, holders of Claims or Interests are hereby notified that (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the IRS,

(ii) any tax discussion contained in this Disclosure Statement is prepared in connection with the promotion of the transactions or matters discussed herein; and (iii) holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax adviser.

Certain payments by the Debtor may be subject to information reporting to the Internal Revenue Service. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## IX.  MISCELLANEOUS PROVISIONS

### 1.  Discharge of Claims and Termination of Interests

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise expressly  provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and complete discharge effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent or liquidated or non-liquidated liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or was deemed to accept or reject the Plan. Any default by the Debtors with respect to any Claim or Interest that existed immediately prior to the Petition Date or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged. Upon the Effective Date, all persons shall be forever precluded and

enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtor, its Estate, or any successor thereto. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

### 2. Compromise and Settlement

Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable.

### 3. Exculpation

The Exculpated Parties, as defined in the Plan, shall neither have, nor incur any liability to any Entity for any prepetition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or post petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor; provided, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further that each Exculpated Party shall be entitled to rely upon the advice of his or her individual counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

### 4. Injunction

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or subject to exculpation pursuant to the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtor: (1) commencing or continuing in any manner any

26

action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Such injunction shall extend to any successors of the Debtor and the Reorganized Debtor and their respective properties and interests in properties. Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties-in-interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 5.  Conditions Precedent to the Effective Date And To Plan Funding

The following shall be satisfied or waived in writing, in each case, as conditions precedent to the Effective Date and to any funding of the Plan by Molokai or its nominee:

a.      The Disclosure Statement and all Exhibits thereto and the Plan and all Exhibits thereto shall be in form and substance acceptable to Molokai or its nominee, in its sole discretion.

b.      The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to Molokai or its nominee, in its sole discretion, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

c.      The Court Bankruptcy Court shall have authorized and the Reorganized Debtor shall have executed and delivered to the Holder of the Class 1 Secured Claim the Wells Fargo Reorganization Note.

d.      The Second Amended and Restated Operating Agreement shall have been entered into and filed with the Wyoming Secretary of State in a form acceptable to Molokai or its nominee, in its sole discretion and any and all conditions precedent to performance by Molokai or its nominee under any agreement relating to the Plan shall have been satisfied.

e.      The Confirmation Order shall have become a Final Order in form and

substance acceptable to Molokai or its nominee, in its sole discretion, and there shall have been no modification or stay of the Confirmation Order or entry of any other court order prohibiting transactions contemplated by the Plan from being consummated.

f.      The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) in form and substance acceptable to Molokai or its nominee, in its sole discretion, authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtor or Reorganized Debtor as contemplated in Article V hereof.

g.      All governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose material adverse conditions on such transactions.

h.      Molokai or its nominee shall not have revoked or withdrawn the Plan pursuant to Article XI.

### 6. Extension of Effective Date

The Debtor or the Reorganized Debtor and Molokai or its nominee may seek an extension of the Effective Date by filing a motion in the Bankruptcy Court on notice to parties in interest.

### 7.      Effect of Non-Occurrence of Conditions to the Effective Date

Each of the conditions to the Effective Date must be satisfied or waived pursuant to Article X.A hereof, and the Effective Date must occur not more than 60 days following the Confirmation Date, or by such later date established by Final Order on motion to the Bankruptcy Court. If the Effective Date has not occurred within 60 days of Confirmation, then upon motion by a party in interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided that notwithstanding the filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters a Final Order granting such motion extending the time of the Effective Date. If the Confirmation Order is vacated pursuant to Article X.C hereof or otherwise, then except as provided in any Final Order vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and Section 1141 of the Bankruptcy Code and the assumptions, assignments, and rejections of Executory Contracts or Unexpired Leases pursuant to Article V, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice

in any manner the rights of such Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

### 8.   Withdrawal, Modification and Amendments

The Plan proponents shall have the right to modify, amend or supplement the Plan and seek Confirmation consistent with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Molokai or its nominee shall have the right to revoke or withdraw the Plan at any time for any reason and in its sole discretion. Without limiting the foregoing and for the avoidance of doubt, Molokai or its nominee shall have the right to at any time revoke or withdraw the Plan whether or not the Debtor joins in or consents to such revocation or withdrawal. Neither Molokai nor its nominee shall have any liability or obligation to any party arising from or as a result of any revocation or withdrawal of the Plan. Molokai or its nominee may indicate such withdrawal or revocation by filing with the Court a notice of such withdrawal or revocation of the Plan.

Every modification of the Plan will supersede the previous version of the Plan as and whenever each modification is effective. When superseded, any previous version of the Plan or Plan provision will be in the nature of a withdrawn or rejected settlement proposal, and will be null, void and unusable by the Debtor or any other party for any purposes whatsoever with respect to any of the contents of such version of the Plan.

### 9.   Retention Of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.   Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

b.   Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c.   Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant

to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtor amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

       d.    Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

       e.    Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

       f.    Adjudicate, decide, or resolve any and all matters related to Causes of Action;

       g.    Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

       h.    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

       i.    Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

       j.    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

       k.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan; resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

       l.    Resolve any and all cases, controversies, suits, disputes, or Causes of Action, with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid;

m.      Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

n.      Adjudicate any and all disputes arising from or relating to payments or distributions under the Plan;

o.      Consider any and all modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Final Order, including the Confirmation Order;

p.      Hear and determine any and all disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

q.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

r.      Hear and determine any and all disputes involving the existence, nature, or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment, regardless of whether such termination occurred prior to or after the Effective Date;

s.      Determine any other matters that may arise in connection with or relate to the interpretation, implementation, or enforcement of the Plan, the Disclosure Statement, or the Confirmation Order, including disputes arising under agreements, contracts, instruments, releases, indentures, or other agreement or document created in connection with the Plan or the Disclosure Statement;

t.      Enforce any orders previously entered by the Bankruptcy Court.


## X. VOTING

Creditors will receive a Ballot with the approved Disclosure Statement and Plan, on which to vote to accept or reject the Plan. Instructions for completing and returning the Ballot are set forth on the Ballot and should be reviewed carefully and followed. **YOUR VOTE IS IMPORTANT.** If you do not vote on the Plan, the wishes of other Creditors or interested parties may govern the treatment, of your Claims or Interests. The Debtor therefore highly recommend that you participate in the voting process by timely providing your Ballot accepting or rejecting the Plan as in the Ballot accompanying this Disclosure Statement.

.

## XI.  RECOMMENDATION OF DEBTOR

The Debtor believes that the Plan provides the best available alternative for maximizing the recoveries that Creditors will receive from Debtor's assets. Therefore, the Debtor recommends that all creditors that are entitled to vote on the Plan vote to accept the Plan.

OLD COLONY LLC

By its counsel,

/s/ Donald F. Farrell, Jr.
Donald F. Farrell, Jr. (BBO 159580)
ANDERSON AQUINO LLP
240 Lewis Wharf
Boston, MA  02110
617-723-3600
dff@andersonaquino.com

Dated:  July 1, 2011