## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 10-21100-HJB |
| OLD COLONY, LLC, | ) |  |
|  | ) |  |
| Debtor | ) |  |
|  | ) |  |

## <u>MEMORANDUM OF DECISION</u>

Before the Court is a motion filed by Wells Fargo, N.A. ("Wells Fargo") to determine the value of its secured claim against Old Colony, LLC (the "Debtor" or "Old Colony") and Old Colony's corollary objection to Wells Fargo's proof of claim.  The motion and objection require the Court not only to determine the value of Wells Fargo's real property collateral, but also to opine upon three ancillary legal issues, each of which has divided bankruptcy courts across the nation – namely: (1) whether a security interest in hotel room revenues is an interest in real property (perfected under state real property recording statutes) or personal property (perfected by filing a financing statement in accordance with the relevant state's adoption of Article 9 of the Uniform Commercial Code); (2) whether postpetition adequate protection payments paid by a debtor to an undersecured creditor holding a security interest in postpetition revenues should be characterized as payment on the principal balance of the secured claim; and (3) whether a secured party's postpetition attorneys' fees are an allowable component of its un(der)secured claim.

I.     FACTS

### A.     Background and Filing of the Bankruptcy Case

Old Colony is a Wyoming limited liability company formed in May 2007 by Joseph
Cuzzupoli, the Debtor's managing member, and John Bullock.[1]  The Debtor owns and
operates The Inn at Jackson Hole (the "Inn"), an 83-room hotel located in Teton Village
(near Jackson Hole), Wyoming.   The Debtor purchased the Inn in 2007 with the
intention of tearing it down and developing a new condominium-hotel.   The purchase
price of $26,000,000 for the Inn, the land, and the personal property (together, the
"Property"), was paid by: (1) $6,000,000 from the Debtor; (2) a $16,500,000 loan from
Jackson State Bank & Trust ("Jackson State"); and (3) $3,500,000 in seller financing.

The parties initially contemplated that the entire $20 million in financing would
come from Jackson State.  Shortly before closing, however, the Debtor learned that
Jackson State would provide only $16.5 million of that amount because it claimed that
its appraisal of the Property was outdated.  Rather than delay the closing while waiting
for an updated appraisal, the parties went forward with the transaction, with Johnson
Resort Properties, Inc. providing the remaining $3.5 million in seller financing (the
"Johnson Loan"), an interest-only loan with a one-year term.  The Debtor intended to
pay off the Johnson Loan upon the completion of an updated appraisal and the
assumed disbursement of the remaining $3.5 million from Jackson State.  However,
after receipt of the updated appraisal, but prior to Jackson State loaning the additional
funds, Jackson State was purchased by Wells Fargo, which declined to make the

---

[1] The Debtor is currently owned by several additional individuals and various corporate entities.
However, Cuzzupoli and Bullock continue to hold a majority aggregate interest in the Debtor
with respective ownership interests of 41.63% and 31.53%.

remaining disbursement.

The Debtor was unable to find an institutional lender to advance the funds needed to satisfy the Johnson Loan and its maturity date was fast approaching.  The Debtor says that, in May 2008, it was thus "forced" to obtain financing through a private lender, JH Lending Trust ("JH Lending"), which loan came with an interest rate of 15% (the "JH Loan").  The Debtor had hoped to refinance either or both of the Wells Fargo and JH Loans, but the prospects for refinancing dwindled with the contraction of the financial markets (and crashing real estate values) following the economic downturn of 2008.  Saddled with the high interest on the JH Loan, the Debtor was unable to keep up with its debt service.  Negotiations between the Debtor and Wells Fargo to restructure the original loan (the "Wells Fargo Loan") came to naught, and the Debtor filed this Chapter 11 Bankruptcy case on October 11, 2010 (the "Petition Date") to stave off Wells Fargo's impending foreclosure.

Shortly after filing the petition, the Debtor filed an emergency motion requesting authorization to use cash collateral (including cash, rents, and revenues from hotel operations), in which both Wells Fargo and JH Lending asserted security interests.  Wells Fargo and the Debtor stipulated to the Debtor's use of cash collateral on an emergency interim basis, but issues remained in dispute.  After an evidentiary hearing held on November 29 and 30, 2010, the Court authorized the use of cash collateral in accordance with the Debtor's submitted operating budget (the "Cash Collateral Order").

The Cash Collateral Order granted Wells Fargo and JH Lending Trust postpetition security interests in the collateral, but only to the extent of the prepetition enforceability of their liens.  The order further provided that the lenders' respective liens would be recognized only to "the extent of any diminution in value of the Lender's cash

and non-cash Collateral." See Stip. Auth. & Approv. Interim Use Cash Collateral, Oct. 15, 2010, ECF No. 24; see also Order re: Debtor's Mot. for Use of Cash Collateral, Nov. 4, 2010, ECF No. 45; Hr'g Tr. Day 2 63:2-9 (Nov. 30, 2010).[2]   The Cash Collateral Order also required the Debtor to pay $40,000 monthly to Wells Fargo "[a]s additional adequate protection for the use of Wells Fargo's alleged cash and non-cash collateral." Cash Collateral Order 5 ¶ 5.   However, the adequate protection payments would not be required "if the Court enter[ed] an order finding that Wells Fargo d[id] not have a perfected security in the revenue generated by the [Inn]." Id.

The parties agree that, as of the Petition Date and prior to the application of adequate protection payments, Wells Fargo was owed a total amount of $17,802,805.43, consisting of $16,500,000 in principal, $1,283,019.99 in interest, and $19,785.44 in prepetition legal fees and expenses.   Stip. Fact 3-4 ¶ 12, Dec. 14, 2011, ECF No. 100.   Further, the parties agree that Wells Fargo incurred $381,158.05 in postpetition legal fees and expenses through November 30, 2011.   Stip. Fact 5 ¶ 20.

**B.    The Inn at Jackson Hole**

The Inn is located in Teton Village, Wyoming, in the heart of the Jackson Hole ski area and near Grand Teton National Park and Yellowstone National Park.   The 83-room Inn is slightly more than 40 years old and offers various amenities, such as a pool and hot tub with deck, above-ground parking, ski in and out access, and an on-site

---

[2] The Cash Collateral Order has been renewed several times during the case, most recently on April 13, 2012.   The substance of the Order has remained the same in all relevant respects. Any reference to the Cash Collateral Order will be to the order as renewed throughout the pendency of the case.   See Agreed Orders Auth. & Approv. Cont. Use of Cash Collateral & Grant of Adequate Protection, Feb. 23, 2011 (ECF No. 70); July 25, 2011 (ECF No. 86); Feb. 7, 2012 (ECF No. 115); April 13, 2012 (ECF No. 126).

restaurant.[3]

As the recreational center for the Jackson Hole mountain resort, tourism drives much of Teton Village's economy. Before the economic downturn in 2008, property development in Teton Village was booming. The Debtor's own plans to raze the Inn and build a four-star, luxury condominium-hotel on the site reflect the demand for development opportunities at the time it purchased the Property. Based upon the Debtor's architectural and development plans, the Property appraised in 2008 at $32 million. Stip. Ex. 6 (the "2008 Appraisal"). With the crash of the financial markets shortly thereafter, however, the Debtor's redevelopment plans evaporated.

The Property thus continues to be operated as The Inn at Jackson Hole. The Debtor contracts with Metwest Terra Hospitality, LLC ("Terra") to manage the Inn, and all of the employees at the Inn are Terra's employees. Terra is responsible for daily management, advertising, reservations, staffing, accounts payable, and maintenance of the Inn's books and records. The Debtor oversees Terra's services, "makes over-arching macro-level decisions with respect to the Inn operations, such as establishing an annual budget for operations, negotiation of management agreements, and determination of policy matters," and maintains the books and records for the Debtor's operations. Discl. Stmt. 5, July 1, 2011, ECF No. 79. According to the Debtor, the Inn has been cash flow positive since the Petition Date and the Debtor has paid all postpetition operating expenses (other than debt service and professional fees). Discl. Stmt. 8. Technically, the Debtor continues to operate the Inn as a debtor in possession.

---

[3] Currently, the restaurant is owned and operated by a company (not affiliated with the Debtor) that leases the space from the Debtor.

### C.   The Disclosure Statement, Chapter 11 Plan, and Valuation Hearing

On July 1, 2011, the Debtor filed a disclosure statement (the "Disclosure Statement") and plan of reorganization (the "Plan") jointly proposed by the Debtor and Molokai Partners, LLC ("Molokai"), a New Jersey limited liability company.[4]  The Plan contemplates that the Debtor (or, rather, Molokai) will remain in possession of the Inn postconfirmation, which will continue to operate as a going concern.  The Plan proposes that the Wells Fargo Loan will be bifurcated into its secured and unsecured components and estimates the secured claim (the "Secured Claim") at $9 million, based on the Debtor's asserted valuation.  The promissory note now held by Wells Fargo will be superseded by a "Wells Fargo Reorganization Note" in the amount of $9 million, secured by the prepetition first mortgage lien.  The un(der)secured portion of Wells Fargo's claim (the "Unsecured Claim") will be paid pro rata with other unsecured claims.  The Plan is to be funded by a $1 million cash infusion from Molokai to be allocated as follows: $623,000 for distribution to unsecured creditors; $150,000 reserve to pay allowed administrative claims in the event the Debtor has insufficient cash on hand to pay all such claims; and $227,000 (plus any money left over from the reserve funds) for capital improvements to the Inn.

On August 31, 2011, after the filing of the Plan, Wells Fargo filed its "Motion of Wells Fargo Bank, N.A. for Valuation of Claim" (the "Valuation Motion"), and the Debtor subsequently objected to Wells Fargo's proof of claim (the "Claim Objection").[5]  In the

---

[4] Unless a distinction is necessary, the Court will refer to the "Debtor's" position as that taken by both the Debtor and Molokai with regard to the Plan and the issues raised in this Memorandum.

[5] The Debtor filed the formal objection to Wells Fargo's claim on December 15, 2011, the day before the evidentiary hearing on the Valuation Motion was to commence.  The Claim Objection raises issues identical to those raised by the Valuation Motion, and the parties agreed that this

motion, Wells Fargo moved pursuant to 11 U.S.C. § 506(a)[6] for an order determining the value of its Secured and Unsecured Claims.  The Debtor and Wells Fargo agree that setting the value of the Secured Claim is a necessary prerequisite to determining the adequacy of the Disclosure Statement and confirmability of the Plan.[7]

While the parties differ as to the value of the Property, there is no dispute that Wells Fargo is undersecured.  The parties further agree that Wells Fargo holds a perfected security interest in any assets described in the mortgage securing the Wells Fargo Loan (the "Mortgage"), Stip. Ex. 3, which was perfected by the recording of the Mortgage in the Wyoming land records.  They also agree that Wells Fargo does not have a perfected security interest in any assets that would have required the filing of a Uniform Commercial Code ("UCC") Article 9 financing statement with the Wyoming Secretary of State in order to perfect a secured interest, since no such financing statement was filed.  Stip. Fact 5.

In order to determine the amount of Wells Fargo's Secured Claim, four issues must be resolved.  The first is the value of the Property, as it is undisputed that Wells Fargo's secured claim against the Property is validly perfected.  The second is whether Wells Fargo holds a perfected security interest in the Debtor's cash and hotel lodging revenues.  Third, the Court must determine the appropriate application of postpetition adequate protection payments received by Wells Fargo during the Chapter 11 case.

Court's disposition of the Valuation Motion will also be dispositive of the Claim Objection.  Trial Tr. Day 1 100:22-101:21, Dec.16, 2011, ECF No. 112.

[6] Unless otherwise stated, all references to statutory sections are to sections of Title 11 of the United States Code (the "Bankruptcy Code" or the "Code").  See 11 U.S.C. §§ 101 et seq.

[7] Regardless of the resolution of the issues currently before the Court, the parties have agreed that the Debtor will file an amended plan and disclosure statement 14 days after the issuance of this Memorandum and accompanying Order.  Stip. Re: Sched. Hr'gs on Valuation & Discl. Stmt. 4 ¶ 6, Aug. 31, 2011, ECF No. 92; Sept. 1, 2011, ECF No. 95.

And fourth, the Court must resolve the question of whether Wells Fargo's postpetition legal fees and expenses can be added to its Unsecured Claim.

A trial on the question of the Property's value was conducted over two days. Four witnesses testified and 19 exhibits were admitted into evidence.  At the conclusion of the trial, the issue of valuation and the additional questions of law were taken under advisement, and the parties were invited to submit proposed findings of fact and conclusions of law.  Both have done so.  The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

II.    POSITIONS OF THE PARTIES

A.    **Value of the Property**

1.    Wells Fargo's Appraisal

Wells Fargo relies on an appraisal conducted by Andrew Cornish of Rocky Mountain Appraisals, Inc.,[8] wherein Cornish opines that the Property has a fair market value of $10,970,000.  Stip. Ex. 4 (the "WF Appraisal").  That value is based largely on his conclusion that the highest and best use of the Property is as a "speculative purchase for future sale or development," WF Appraisal 71, and not the continued operation of the Inn.

Cornish began his analysis by valuing the Property under the income capitalization approach, calculating the going-concern value of the Property at $10,306,897.89.  He then used a modified sales comparison approach, and concluded that the value of the Property determined in this way is $10,970,000.  He reached that

---

[8] The parties have agreed that both the Debtor's and Wells Fargo's appraisers are qualified to testify as expert witnesses.  Stip. Fact 6.

valuation by reasoning as follows: first, using a classic sales comparison approach, he concluded that value of the Property as essentially "vacant" land was $8,275,000. But because he believed that immediate development of the Property was not feasible given the current market, Cornish next assumed that a prospective purchaser would likely conclude that the Inn should remain in operation during a "hold" period of 5 years before it was demolished and new development begun. Accordingly, using the stabilized net operating income determined during the income capitalization portion of his analysis, he added $2,770,000 to the value of the land – an amount equal to 5 years' net operating income – and subtracted the costs of demolition and a small amount of capital necessary to maintain the Inn during the hold period.

The Debtor criticizes Cornish's appraisal in several respects. With regard to the valuation of the land as vacant, the Debtor maintains that Cornish's approach was too speculative to warrant consideration. The Debtor also discounts the comparable sales relied on by Cornish as largely irrelevant. Two of the comparable sales pre-date the 2008 economic downturn, and the Debtor says they are too remote in time and economic circumstance to be given any weight. Cornish's remaining two comparables were based not on closed sales but on undisclosed purchase and sale agreements. In the Debtor's view, they are inadmissible. The Debtor further argues that Cornish did not substantiate his assumption that a 5-year "hold" period was appropriate.

The Debtor argues that, because the Plan provides for the Debtor to actually retain and operate the Inn, the Property should have been valued based on that proposed use. Accordingly, says the Debtor, the only appropriate valuation is that used by *its* appraiser, the income capitalization approach. And the Debtor criticizes Cornish's income capitalization analysis because, the Debtor says, it failed both to account for the

value of the personal property at the Inn and to consider in more depth the true general

expenses and capital expense requirements of the Inn in operation.

### 2.   The Debtor's Appraisal

Christopher Kraus of PKF Consulting, Inc. conducted an appraisal of the

Property on behalf of the Debtor.  Stip. Ex. 5 (the "Debtor's Appraisal").  According to

his appraisal report and testimony at trial, Kraus opines that best use of the Property is

its continued operation as the Inn, because current market conditions do not support the

demolition and redevelopment of the Property.  He did not rely heavily on a sales

comparison analysis due to the lack of comparable sales transactions.  But using an

income capitalization approach, and deducting $1,150,000 for needed capital

improvements, Kraus concluded that the Property has a fair market value of

$9,900,000.  Further deducting $498,000 from that total to account for Kraus's estimate

of the personal property value, the Debtor says that the Property's current value is

$9,402,000.

Wells Fargo criticizes Kraus's appraisal for failing to appropriately support his

conclusion that the "highest and best use" of the Property was the continued operation

of the Inn and not a purchase for future redevelopment.  Wells Fargo says that Kraus

did not explicitly perform a highest and best use analysis, because he was guided by

Cuzzupoli in selecting a going-concern analysis from the outset.  Wells Fargo notes that

Kraus himself valued the Property at $32 million in 2008 as a redeveloped

condominium-hotel, and his failure to consider the Property's value based on possible

future redevelopment was an error.  According to Wells Fargo, Kraus's summary

conclusion regarding the best use of the Property was inconsistent with the Uniform

Standards of Professional Appraisal, because it was not based on an objective,

quantitative analysis of the Property as vacant land.

Wells Fargo also maintains that the $1,150,000 deduction for capital expenditures was inflated and reflects more than is necessary for the Inn to maintain its current operations. In its own analysis of the proposed capital expenses, Wells Fargo concludes that $706,200 of the claimed expenditures is for "non-essential" improvements. Furthermore, since the Plan contemplates only a $227,000 contribution for capital improvements, Wells Fargo says the remaining $443,800 in expenses is not justified. Thus, according to Wells Fargo, Kraus's concluded value of the Property should be revised to discount these unnecessary expenditures.

Wells Fargo further argues that Kraus's allocation of $498,000 to the value of personal property is not reliable or justified since he is not a personal property appraiser and does not distinguish between fixtures and personalty. Accordingly, Wells Fargo argues that no deduction from Kraus's concluded value should be made on account of the asserted value of the personal property.

### B. Wells Fargo's Asserted Security Interest in Postpetition Revenues

In addition to granting a lien on the Property itself, the Mortgage also grants Wells Fargo a lien on all of the Debtor's "right, title, and interest in and to all present and future leases of the Property and all Rents from the Property." Mortgage 1. The Mortgage was properly recorded in the office of the Teton County Clerk, but no financing statement is on file with the Wyoming Secretary of State. Stip. Fact 5. The parties focus their arguments on the issue of whether the security interest in the Inn's room revenues (the "Room Revenues") is an interest in real property, perfected by the recording of the Mortgage, or an interest in personal property, which can only be perfected by the filing of a financing statement with the Wyoming Secretary of State

pursuant to Article 9 of the UCC.

### 1.  Wells Fargo: Room Revenues are Rents

Not surprisingly, Wells Fargo argues that the Room Revenues are rents and that the assignment of those rents was perfected when it recorded the Mortgage.  Wells Fargo urges the Court to adopt the approach taken in cases such as <u>Financial Security Assurance, Inc. v. Days California Riverside Ltd. Partnership (In re Days California Riverside Ltd. Partnership)</u>, 27 F.3d 374 (9th Cir. 1994), and <u>T-H New Orleans Ltd. Partnership v. Financial Security Assurance, Inc. (In re T-H New Orleans Ltd. Partnership)</u>, 10 F.3d 1099 (5th Cir. 1993).  In those cases, the Ninth and Fifth Circuit Courts of Appeals, respectively, concluded that hotel room charges are "rents," because, *inter alia*, they represent payments for use of real property and because the parties intended that the assignment of rents clauses in those cases would encompass hotel room revenues.  10 F.3d at 1106; 27 F.3d at 376, 377.  Wells Fargo asks this Court to agree with the analyses in <u>T-H New Orleans</u>, <u>Days California</u>, and other cases, where the courts have held that a general understanding of the meaning of *rent*, coupled with underlying economic realities, compels the conclusion that the Room Revenues are *rents*.

In further support of its argument, Wells Fargo points to Wyoming statutes that refer to the occupancy of a hotel room as a *rental*, arguing that this indicates that hotel room payments are considered *rent* under Wyoming law.  Additionally, Wells Fargo notes that both the Restatement (Third) of Property and the Uniform Assignment of Rents Act define *rent* as a payment primarily for the possession, occupancy, or use of real property, and both include hotel room charges within that definition.

In response to the Debtor's assertion that a majority of courts consider hotel

room revenues to be accounts receivable – personal property subject to the perfection requirements of Article 9 of the UCC – Wells Fargo argues that those courts applied an overly-formalistic approach in distinguishing the landlord/tenant relationship from the hotel owner/guest relationship.  Wells Fargo says those cases also do not account for the references to hotel revenues as *rents* in Wyoming statutes and ignore economic realities.  Finally, Wells Fargo maintains that, even if the Room Revenues do not constitute *rent*, they are subject to its prepetition lien as "proceeds" or "profits" of the Property.

### 2.  The Debtor: Room Revenues are *Not* Rents

The Debtor says that Wells Fargo's argument has been rejected by the majority of courts that have considered it.  Therefore, the Debtor would have the Court adopt the majority approach and find that the Room Revenues are not *rents*, but rather accounts receivable – personal property for which a perfected security interest required the filing of a UCC statement in the Wyoming Secretary of State's office.  Since no financing statement is on file, the Debtor concludes that Wells Fargo has no perfected security interest in the Room Revenues.

Relying on other statutory provisions, the Debtor maintains that Wyoming law "delineates and distinguishes between a 'landlord and tenant' relationship and an 'innkeeper and guest' relationship."  Debtor's Post-Trial Mem. 20 ¶ 14, March 9, 2012, ECF No. 123.  Accordingly, the Debtor argues that while a tenant may pay *rent*, a guest in a hotel does not.  Instead, the hotel guest has only a license to use the property – creating an account receivable that is considered personal, not real, property under the UCC.  The Debtor further contends that the loan documents themselves reflect the parties' understanding that the filing of a UCC financing statement was required to

perfect the security interest in the Room Revenues, and that understanding validates the conclusion that the Room Revenues constitute personal property subject to Article 9.

### C. Application of the Postpetition Adequate Protection Payments

1. <u>Wells Fargo: Postpetition Revenues are Added to the Secured Claim</u>

Wells Fargo argues that because § 552(b) extends its perfected security interest in the Room Revenues to the revenues acquired postpetition, the Room Revenues represent collateral additional to the Property.  Wells Fargo thus maintains that the collateral securing its claim has been increasing in value from and after the Petition Date.  Therefore, Wells Fargo asks the Court to conclude that, by paying a portion of that cash collateral back to the bank, the Debtor has done nothing more than decrease the postpetition accrual of the Secured Claim, and the value of its Secured Claim with respect to its other collateral (the Property itself) should not be reduced by those payments. [9]  Wells Fargo essentially asks this Court to adopt the holding in <u>Beal Bank S.S.B. v. Water's Edge Limited Partnership</u>, 248 B.R. 668 (D. Mass. 2000), and rule that the postpetition adequate protection payments simply "creat[ed] a wash between asset value and payments received by the creditor."  Wells Fargo's Post-Trial Brief 25 ¶ 77, March 9, 2012, ECF No. 122.

Wells Fargo further argues that, even if this Court were to conclude that its security interest in the Room Revenues was not perfected, it was entitled to receive the adequate protection payments to protect against a diminution in the Property's value. Relying on testimony at trial to the effect that the Inn's revenues have declined during

---

[9] As of December 1, 2011, the Debtor had made adequate protection payments to Wells Fargo in the total amount of $460,000.  Stip. Fact 4 ¶ 19.

the case, "which has likely resulted in a corresponding diminution in value of the Property," id. at 27 ¶ 82, Wells Fargo says it is entitled to the adequate protection payments as compensation for a reduction in the Property's value, which diminution in value should be measured during the confirmation process.

2. The Debtor: Postpetition Payments are Subtracted from the Secured Claim

Because the Debtor maintains that Wells Fargo does *not* have a perfected security interest in postpetition Room Revenues, it also argues that those accumulated revenues could not have increased the amount of the Secured Claim.  And since the Debtor says Wells Fargo's assertion that the Property has likely diminished in value postpetition has not been demonstrated, the Debtor further argues that the bank was not entitled to the payments as adequate protection.  According to the Debtor, then, the payments can only be applied to reduce the amount of the Secured Claim, and should be deducted from the determined value of the Property.

**D.  Postpetition Legal Fees and Expenses**

1. Wells Fargo: Postpetition Attorneys' Fees Can be Added to the Unsecured Claim

Wells Fargo asks the Court to allow its request to add its postpetition attorneys' fees to the amount of the Unsecured Claim.  Because its prepetition contracts with the Debtor provide that the bank's attorneys' fees can be charged against the Debtor, Wells Fargo says it is entitled to claim those fees as part of its unsecured claim in light of Travelers Casualty & Surety Co. of North America v. Pacific Gas & Elec. Co., 549 U.S. 443 (2007), where the Supreme Court held that a prepetition contract allocating payment of attorneys' fees is enforceable in bankruptcy unless the Bankruptcy Code provides otherwise.  Relying on SNTL Corp. v. Centre Insurance Co. (In re SNTL

Corp.), 571 F.3d 826 (9th Cir. 2009), and <u>Ogle v. Fidelity & Deposit Co. of Maryland</u>, 586 F.3d 143 (2d Cir. 2009), Wells Fargo says that its entitlement to attorneys' fees under prepetition contract constitutes a contingent claim within the meaning of §101(5)(A), which contingency (actually incurring the fees) occurred postpetition.  Wells Fargo further maintains that the reference to allowance of attorneys' fees in § 506(b) is relevant only to determining whether the fees may be applied to the secured portion of a creditor's claim, and does not prohibit the addition of postpetition attorneys' fees to the unsecured portion of the claim if allowed by a prepetition contract.

　　　　　2.   <u>The Debtor: Postpetition Attorneys' Fees are Not Allowable as Part of the Unsecured Claim</u>

The Debtor argues that Wells Fargo is not entitled to legal fees or expenses, because those claims are "categorically disallowed" to undersecured or wholly unsecured creditors by § 506(b), which provides for the inclusion of postpetition attorneys' fees only if a creditor is oversecured.  Because it is undisputed that Wells Fargo is undersecured, the Debtor maintains that Wells Fargo is entitled to no postpetition attorneys' fees, whether as part of its secured or unsecured claim.   In addition, the Debtor asserts that even were Wells Fargo entitled to add the postpetition attorneys' fees to its unsecured claim, Wells Fargo has failed to demonstrate the reasonableness of its fees and expenses, and such a determination must be postponed for further hearing.

III.    DISCUSSION

   **A. Value of the Property**

Because Wells Fargo is undersecured, § 506(a) mandates that the amount of the

Secured Claim be determined by reference to the value of its collateral. 11 U.S.C.

§ 506(a) ("An allowed claim of a creditor secured by a lien on property in which the

estate has in interest . . . is a secured claim to the extent of the value of such creditor's

interest in the estate's interest in such property . . . ."); United Sav. Ass'n. of Texas v.

Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 372 (1988) ("The phrase 'value of

such creditor's interest' in § 506(a) means 'the value of the collateral.'"); In re SW Hotel

Venture, LLC, 460 B.R. 4, 25 (Bankr. D. Mass. 2011) ("the court must determine the

value of the secured creditor's collateral").[10]  "In determining fair market value, 'the court

can only endeavor to make a reasonable estimate of value based upon expert

testimony presented to it in court,'" In re Park W. Hotel Corp., 64 B.R. 1013, 1020

(Bankr. D. Mass. 1986) (quoting Peninsula Fed. Savs. & Loan Ass'n. v. R&H Inv. Co.,

Inc. (In re R&H Inv. Co, Inc.), 46 B.R. 114, 116 (Bankr. D. Conn. 1985)), keeping in

mind that the value must also "be determined in light of the purpose of the valuation and

the proposed disposition or use of the property that is collateral," SW Hotel, 460 B.R. at

25 (citing In re Winthrop Old Farm Nurseries, Inc. v. N. Bedford Inst. for Savs. (In re

Winthrop Old Farm Nurseries, Inc.), 50 F.3d 72, 75-76 (1st Cir. 1995)).

   As this Court has previously explained:

   It is well understood that there are three (3) recognized methodologies for

---

[10] Pursuant to Bankruptcy Rule 3012, "the court may determine the value of a claim secured by
a lien on property in which the estate has an interest on motion of any party in interest and after
a hearing on notice to the holder of the secured claim and any other entity as the court may
direct."  Fed. R. Bankr. P. 3012.

valuing real estate.  By the cost approach, the appraised value typically reflects the reproduction cost or the replacement cost of the subject property.  The sales comparison approach relies on recent comparable sales.  Those sales prices are then adjusted by the degree to which those properties differ from the subject property.  By the income approach, the net operating income of the property (gross income less the expenses) is divided by a capitalization rate to obtain the fair market value of the property.  Because the cost approach rarely provides an accurate reading of the fair market value of the real estate, appraisals routinely disregard it or mention it only in passing, and concentrate their efforts on the sales comparison and income approaches and then adjust for any differences between the two.

150 N. St. Assocs. Ltd. P'ship v. City of Pittsfield (In re 150 N. St. Assocs. Ltd. P'ship), 184 B.R. 1, 6 (Bankr. D. Mass. 1995).  In this case, neither expert relied on the cost approach to value the Property, instead utilizing – to different degrees – the sales comparison and income approaches.

1.  The Property as Vacant Land for Future Redevelopment: The Sales Comparison Approach

Cornish[11] concluded that the Property's value is $10,970,000 based on a highest and best use of the Property as "speculative purchase for future resort development." WF Appraisal 71.  Accordingly, he placed full weight on the sales comparison approach for his final analysis.  The highest and best use of a property is "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."  WF Appraisal 65 (quoting Appraisal Institute, The Appraisal of Real Estate, 306 (12th ed. 2001)); see also In re Waterville Valley Town Square Assocs., 208 B.R. 90, 96

---

[11] The parties stipulated that both appraisers testifying in this matter are experts in their field, and the Court agrees.  Cornish's background appraising real estate in the Jackson area for over twenty years, together with his MAI designation from the Appraisal Institute (a designation of advanced competency in commercial appraisals) and his credible testimony, leave the Court with no doubt that he is highly qualified.

(Bankr. D.N.H. 1997) (quoting Appraisal Institute, The Dictionary of Real Estate Appraisal (3d ed. 1993)).    Both appraisers testified, and the Court agrees, that redevelopment of the Property is both legally permissible and physically possible.  The Court is not persuaded, however, that Cornish's conclusion as to the highest and best use of the Property was either "appropriately supported" or "financially feasible."

Cornish relied on four properties in undertaking a sales comparison analysis to determine the value of the Property as essentially "vacant land."   The first sale ("Comparable 1") occurred in February 2008, arguably prior to the economic downturn, and related to a much smaller property containing an outmoded hotel.   The fourth comparable used ("Comparable 4") was the prior sale of the Inn to the Debtor.   As previously noted, that sale occurred in 2007, also prior to the economic downturn.   To adjust for changing market conditions, Cornish discounted the sale prices of Comparables 1 and 4 by 55% and gave them less weight in the final determination of the Property's current value.

However, even with the 55% discount to account for the devaluation of property since the latter part of 2008, the Court finds that neither Comparable 1 nor Comparable 4 are reliable benchmarks for comparison to determine the Property's value today.  Not only are those sales quite remote in time (between 3 and 4 years before Cornish's appraisal), but there was no reliable proof that even a discount of 55% appropriately accounted for the decreased value of similar properties since 2008.  Cornish testified that the 55% discount was chosen based primarily on a review of depreciating values of condominiums in the area, where values had depreciated between 24.90% and 55.63%. But the largest percentages of depreciation (43.62% and 55.63%) were taken from the asking prices of two properties that remained active listings at the time the appraisal

was conducted – leaving open the possibility that the final sale price would be less than the amount sought (thus increasing the amount of depreciation).[12]  And with respect to Comparables 2 and 3, Cornish noted that *those* properties had been devalued from 2007 in the respective amounts of 61.06% and 52.62%.  In sum, given the span of time since Comparable Sales 1 and 4, taken together with the substantial (and not yet fully understood) depreciations in value, the Court is not persuaded that Cornish's adjustments for Comparables 1 and 4 are sufficiently accurate to form any basis for estimating the Property's value.

Comparables 2 and 3 are likewise entitled to little weight, but for different reasons.  Both were pending sales at the time of the appraisal and ultimately, according to Cornish's testimony, neither sale was ever consummated.  Cornish testified that the failure of the pending sales to close had no effect on his opinion of valuation, since they represented a "meeting of the minds of a buyer and a seller that happened the first time in three or four years where they met at a particular price . . . . So – negotiations is as valuable information as I have, and it doesn't affect my current opinion."  Trial Tr. Day 1 85: 24-86:6.

While pending sales of properties other than the property being appraised may be admitted in connection with a valuation hearing, the Court cannot give them substantial weight here.[13]  First, while the Court finds that Cornish's adjustments to

---

[12] In fact, in the appraisal, Cornish notes that two recent sales of condominiums reflected 76.5% and 65% devaluations, respectively.  WF Appraisal 32.  While these were distress sales and may represent a steeper value drop than for other properties in the area, the depression of prices in the market resulting from a high volume of distressed sales led Cornish to state that condominium prices "may be poised for more devaluation."  WF Appraisal 34.

[13] The Court disagrees with the Debtor's assertion that the fact that Comparables 2 and 3 were pending sales renders them inadmissible for the purpose of establishing the Property's value. While mere offers to purchase have been found inadmissible to establish market value, <u>see,</u>

Comparables 2 and 3 were justified and reasonable, there are no comparable closed sales to support the conclusion that the pending sale prices can accurately be used to determine the market value of the Debtor's Property.

More importantly, the lack of closed sales and the fact that neither of the pending sales was ultimately consummated raise a substantial question as to whether purchase of the Property with the intent to later redevelop it (rather than a purchase of the Property in order to operate the Inn as a going-concern) is, as Cornish determined, actually financially feasible.   Cornish concedes that "the development of new commercial product is currently not financially feasible due to the existing soft market." WF Appraisal 71.   This conclusion is certainly unassailable, especially in light of the abundance of data cited throughout the appraisal.[14]   Cornish therefore concludes that

_____

e.g., U.S. v. Smith, 355 F.2d 807, 811 (5th Cir. 1966), an executed purchase and sale agreement may be admissible, even where the agreement relates to a property other than the one being valued, see, e.g., United States v. 312.50 Acres of Land, More or Less, Situated in Prince William Cnty., Commonw. of Va., 812 F.2d 156, 157 (4th Cir. 1987); Smith, 355 F.2d at 812; Wolff v. Commonw. of P.R., 341 F.2d 945, 947 (1st Cir. 1965) (purchase and sale agreement was some evidence of property value); City of Pheonix v. Clauss, 869 P.2d 1219, 1223 (Ariz. Ct. App. 1994) ("executory contracts for sale are admissible as comparable sales in condemnation proceedings"); but see Brush Hill Dev., Inc. v. Commonwealth, 155 N.E.2d 170, 174 (Mass. 1959) (noting that the Massachusetts Supreme Judicial Court had stated in other cases that purchase and sales agreements were not admissible for property other than the one being valued; but also noting that it did not, in the case before it, need to "reconsider these two decisions or determine whether possible infirmities in such testimony . . . should not more reasonably go to the weight of the testimony than its competency").   The Court does conclude, however, that pending sales agreements may be given less *weight* where the contract is to purchase property other than the one being valued or if the sale was never consummated. See, e.g., Clauss, 869 P.2d at 1223 ("objections to the validity of executory contracts affect the *weight* of the evidence rather than its *admissibility");* J. William Costello Profit Sharing Trust v. State Roads Comm'n, 556 A.2d 1102, 1104 (Md. 1989) ("Unlike offers and options, contracts for the purchase of land are binding obligations, not lightly ignored; the fact the contracts have not progressed into sales seems to go to the weight of the evidence rather than to its sufficiency.") (quoting State Roads Comm'n v. Wyvill, 223 A.2d 146, 153 (Md. 1966)).

[14] See, e.g., WF Appraisal 15 (drastic reductions in construction industry tax collection in 2010 and 2011 "reflect[ ] the cessation of the robust real estate economy"); 16 ("Prior to the current economic correction, plans for several new resorts were being investigated by developers . . . . However, the recent economic downturn has currently stopped plans for such development");

the Property should be valued based on a *speculative purchase for future development*.

But he does not explain why speculative future development is any more feasible at this

juncture than immediate development.   Cornish views Comparables 2 and 3 as

evidence that there is currently a market for properties that have future development

potential, but the failure of those sales to reach closing may be indicative of a lack of

confidence in the financial feasibility of such future development.[15]

As Cornish himself notes, the sales comparison approach is "applicable when an

active market provides sufficient quantities of reliable data that can be verified from

authoritative sources" and  "is relatively unreliable in an inactive market or in estimating

the value of properties for which no real comparable sales data is available."  WF

Appraisal 83.  The market for vacant land to be purchased for future development in the

Teton Village area is functionally inactive at this time and the paucity of comparable

sales results in insufficient data for comparison.[16]  The Court is therefore not persuaded

---

18 (approved expansion development at Grand Targhee Ski Area has not has taken place due
to the economic downturn); 20 (nearly completed development of spa and retail building at
Snow King Mountain stalled due to economic downturn); 25 (real estate industry contracting as
result of current recession); 34 (building permit data for 2008-2010 are "indicative of a reported
13 year low mark that is reflective of current economic conditions."); 35 (hardest hit commercial
real estate "has been development parcels" for mixed use; "[r]edevelopment of these parcels is
now not economically feasible"); 39 (prior to 2008, vacant commercial land prices were growing
in Teton Village, but "[n]o sales of large development parcels have occurred in the time period
subsequent to the value correction" and "Teton Village development parcels are opined to be a
relatively hard-hit segment of the market"); 42 ("investor and resort properties such as condo-
tels may take longer to recover, as new avenues for the retail financing of these products needs
to evolve").

[15] At trial, Cornish alluded to a recent purchase of property in the area where development plans
are already in place.  Trial Tr. Day 1 43:17-22.  The Court is unable to factor this purchase into
its analysis, however, as it is not contained in the appraisal and no details relative to that sale
were provided through testimony.  And Cornish further testified that there is currently no active
development in Teton Village.  Trial Tr. Day 1 65:1-11.

[16] Interestingly, Cornish concluded with regard to his income capitalization analysis that a sales
comparison approach to the Property as a going concern was inappropriate since "[t]here are no
such comparables that exist that would in any way enhance or increase the reliability of the

that Cornish appropriately supported his conclusion that the speculative purchase of the Property for future redevelopment represents the highest and best use of the Property.

Cornish's appraisal suffers from a further infirmity that diminishes its reliability as an adequate estimate of the current market value of the Property. Because he concludes that the Property, if purchased for redevelopment, would not actually be redeveloped immediately, he factors in the income from the Property that would be generated during the "hold" period. He hypothesizes a 5-year hold period, in part because he concluded that the Property would require significant maintenance at the end of those five years. See WF Appraisal 105. But he also testified that his 5-year hold hypothesis was reached intuitively and the determination was difficult because "[i]t's predicated on the emotions of the market and the velocity of sales." Trial Tr. Day 1 40:20-21; see also Trial Tr. Day 1 94:13-15 ("it just seems that five years was best replicating what I felt and what I felt a buyer would feel coming to the market"). He further testified that the hold period chosen by a potential purchaser could be shorter or longer, and that changes to the hypothesized hold period would affect the total value estimate. See Trial Tr. Day 1 64:18-22; 95:15-96:19. The Court finds that there was insufficient evidence (i.e., market or other data) to conclude that a 5-year hold period is an appropriate length of time to employ for the needed analysis. Given that the amount of time used as a hold period had such a direct impact on the ultimate estimated value of the Property, the Court concludes that the portion of value attributable to that income-producing hold period is unreliable.

---

report . . . ." Trial Tr. Day 1 97:15-23. The relative non-existence of adequate comparables, however, did not similarly lead Cornish to conclude that his valuation of the Property as vacant land was not reliable.

In sum, the Court finds that the value of the Property asserted by Wells Fargo is too speculative and unreliable to sufficiently persuade the Court that its value should be adopted for purposes of the present Valuation Motion.  Accordingly, the Court finds that the income capitalization approach is the more appropriate vehicle for estimating the value of the Property in this case.[17]

2.  The Property as a Going Concern: The Income Capitalization Approach

Both Kraus[18] and Cornish used an income capitalization approach to estimate the value of the Property as a going concern, relying on historical financial information

---

[17] Because the Court finds that Cornish's conclusion regarding the highest and best use of the Property as essentially vacant land is not adequately supported, the Court declines to weigh in on the current debate in the case law regarding whether a valuation that considers a use different from that proposed by the Debtor should be considered in conjunction with a § 506(a) valuation.  Compare, e.g., In re Bell, 304 B.R. 878, 881-82 (Bankr. N.D. Ind. 2003) (under Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997), the question is whether the debtor proposes to surrender or retain the property; if the debtor proposes to retain, the property must be valued at replacement value, not necessarily dependent upon debtor's proposed use of the property);  In re Sherman, 157 B.R. 987, 991-92 (Bankr. D. Texas 1993) (equities compelled valuation at highest and best use different from the use proposed by debtors); In re Ehrich, 109 B.R. 390, 392 (Bankr. D.S.D. 1989) (real estate should be valued at its highest and best use if the creditor can prove the land is more valuable for a purpose different than that proposed by the debtor and that the highest and best use is not speculative); Speck v. United States, 104 B.R. 1021, 1023 (Bankr. D.S.D.1989) ("[w]hile the use proposed by the debtor should be considered in determining the value of the collateral, the bankruptcy judge should not have his hands tied"); with McElwee v. Adams Cnty. Nat'l Bank (In re McElwee), 449 B.R. 669, 672 (Bankr. M.D. Pa. 2011) (court must give due consideration to debtor's intended use of the property; proposed use is pivotal to determining valuation); In re Bishop, 339 B.R. 595, 600 (Bankr. D.S.C. 2005) (Supreme Court's mandate in Rash requires court to examine debtor's actual proposed use of property, "*not* the various dispositions or uses that *might* have been proposed") (quoting Rash, 520 U.S. at 964); United States v. Donato (In re Donato), 253 B.R. 151, 155 (Bankr. M.D. Pa. 2000) ("to automatically apply the 'highest and best' use value to the real estate, without examining its proposed or intended use, is not proper"); In re Foster, 79 B.R. 906, 908 (Bankr. D. Mont. 1987) (debtor's proposed use should determine focus of appraisal and value should not be based on "speculating on uses different from those proposed in the plan").

[18] As with Cornish, this Court agrees with the parties that Kraus, with over 14 years of experience with PKF (a hotel consulting firm providing a variety of services, including hotel valuation) is highly qualified as an expert in the field of hotel valuations, and the Court found his appraisal and testimony to be both credible and thorough.

provided by the Debtor and verified as reasonable through comparison to objective market data. Both Kraus and Cornish supported their estimated stabilized net operating income and capitalization rates through analysis of relevant sources. And, in fact, their concluded values under the income capitalization approach were quite close under the circumstances – a difference of $406,897.89. The Court ultimately finds, however, that adoption of the value estimated in Kraus's appraisal is far more justified than that posited by Cornish.

One area of major difference between Cornish and Kraus's values lies in their different analyses of the cost of capital improvements that are needed for the Property. Cornish factored in only $75,000 worth of capital expenditures in discounting the Property's market value. He chose that value, however, because he had already concluded that the Inn would be razed after 5 years, and the $75,000 reflected only those improvements he believed were necessary to maintain the Property through that 5-year period. Thus, his capital expenditure figure did not account for several maintenance issues that pose much larger cost challenges to the Property as a going concern. For instance, Cornish's appraisal "assumes the integrity of the rear retaining wall," WF Appraisal 5, which clearly is an issue of some concern. See Id. (describing problems with wall); see also Debtor's Appraisal III-14 (incorporating cost of repair of wall). Cornish also did not include any capital expenditures for replacement or maintenance of the roof, another high-cost maintenance item that is apparently a significant problem for the Property. See Stip. Ex. 7 (estimating cost of roof repair); Trial Tr. Day 2 80:13-14 (Feb. 17, 2012), ECF No. 117. Accordingly, the Court concludes that Cornish's appraisal does not appropriately take into account the cost of capital expenditures a potential purchaser would anticipate if buying the Property and

would factor into the purchase price.

Even more problematic is Cornish's admission that his income capitalization approach did not use as "refined" an accounting of capital expenditures as would have been used if determining value solely based on that approach.  He testified that there was some "fine tuning . . . that would have needed to be examined if I had determined [the going-concern value of the Inn] to be the highest and best use, probably of more refined expense accounting and other things that in observation would have only diminished this value and made that 10.3 million dollar value less than it actually is." Trial Tr. Day 1 63:3-9.  Since Cornish admits that his income capitalization approach was essentially incomplete, as it failed to fully consider the capital expenditures a buyer would anticipate when purchasing the Property, the Court finds that Kraus's income capitalization value is more reliable.

Wells Fargo takes issue with Kraus's $1.15 million deduction for capital expenditures, arguing that those expenditures are not necessary for the Inn to maintain its current performance levels.  Given the age and condition of the Inn observed during his site visit, Kraus requested information regarding historical capital expenditures and management and ownership plans for capital expenditures going forward.  Upon receipt of that information, he determined that the listed expenses were, in his experience, "a reasonable amount of capital that would need to be spent . . . in order for [the Property] to . . . really stay competitive, not lose market share and begin to further deteriorate." Trial Tr. Day 2 33:11-14.  Richard Walls, Terra's Vice President of Finance and Administration employed by the Debtor to manage the operations of the Inn, also testified that the list of capital expenditures provided to Kraus were those items necessary to "maintain the revenues" and "hold the rate."  Trial Tr. Day 2 80:9-10;

102:19.

Wells Fargo also intimates that the capital expenditure amount was inflated after the Debtor and Walls received a copy of a draft appraisal.  However, Kraus's testimony was that he received an initial capital expenditure list prior to disseminating the draft appraisal, and that the subsequently-received list was simply an updated estimate of capital expenditures.  Trial Tr. Day 2 57:7-59:17.  The Court found his testimony on this point to be credible and supported by a relevant email exchange between Walls and Kraus submitted into evidence by Wells Fargo.  See Wells Fargo Exs. 10, 11; Stip. Ex. 7.  The emails contain no statement that would raise a suspicion that Walls was trying to inflate the capital expenses to lower the Property's value – indeed, the communications are nothing more than an inquiry by Kraus requesting updated information in order to finalize the appraisal and Walls's succinct response.  The Court therefore concludes that the testimony of Kraus and Walls, as well as the relevant exhibits, support Kraus's use of the $1.15 million capital expenditure deduction in his appraisal.

### 3.  Value of the Personal Property

Kraus concluded that the value of the personal property was $498,000, based on the replacement cost of the personal property contained in the rooms discounted to reflect its depreciation.  The Court does not quarrel with that valuation.  But, although Walls testified that the personal property in the rooms was not attached (with the exception of drapery hardware), the Court cannot discern from Kraus's appraisal whether and to what extent any of *his* personal property valuation reflected the value of fixtures.  As such, the Court reiterates the position that it took at the conclusion of trial,

that "Wells Fargo presented me with no evidence on the point [19] and the debtor's

evidence is not useful. . . . So I'm looking at [the reduction of value attributed to non-

fixtures] having been waived . . . ." Trial Tr. Day 2 128:9-129:2.[20]  Therefore, the Court

deducts no amount for the valuation of personal property, as it has received no reliable

evidence regarding the value of personal property minus the value of the fixtures.

In sum, the Court finds that Kraus's appraisal is more reliable and persuasive

and accords it substantial weight.  The Court accepts the Debtor's asserted value of the

Property, but without a discount for the purported value of personal property.

Accordingly, the Court finds that the Property's value is $9,900,000.

### B.  The Security Interest in Room Revenues

The loan and mortgage executed by the Debtor clearly contemplated that

Jackson State (and now Wells Fargo) would obtain a security interest in all of the

Debtor's property – both real and personal.  In addition to securing the Wells Fargo

Loan with a lien on the Property, the Mortgage states:

> Grantor presently assigns to Lender *all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.*
>
> THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT AND PERFORMANCE OF THE OBLIGATIONS AND (B) PERFORMANCE OF ANY AND ALL ADDITIONAL OBLIGATIONS UNDER THE NOTE . . . , THE LOAN DOCUMENTATION, AND THIS MORTGAGE.

---

[19] Because Cornish valued the Property as though the buyer would plan to demolish the Inn after 5 years, the value of the personal property was irrelevant to his analysis.  Trial Tr. Day 1 50:22-51:20; 68:12-18.

[20] The Court's use of the term "waived" was inartful.  Said properly, the Debtor failed to meet its burden of proof.

Mortgage 1 ¶ 5 (emphasis supplied).  *Rents* are defined as "all present and future rents, revenues, income, issues, royalties, profits and other benefits derived from the Property."  Id. at 11.[21]

Wyoming law governs the creation and perfection of the security interests under the Mortgage, Butner v. U.S., 440 U.S. 48, 55 (1979), although the Wyoming Supreme Court has stated that "[d]ecisions of other courts offer persuasive support when questions of the interpretation of uniform laws arise."  B&W Glass, Inc. v. Weather Shield Mfg., Inc., 829 P.2d 809, 814 (Wyo. 1992).  Perfection of a security interest in real property is governed by statute (the "Recording Statutes"); Wyoming Statute § 34-1-121 provides that:

> Each and every deed, mortgage, instrument or conveyance touching any interest in lands, made and recorded, according to the provisions of this chapter, shall be notice to and take precedence of any subsequent purchaser or purchasers from the time of the delivery of any instrument at the office of the county clerk, for record. . . .

Wyo. Stat. § 34-1-121; see also Countrywide Home Loans, Inc. v. First Nat'l Bank of

---

[21] Personal property is addressed in the Loan Agreement, which provides:

> (b)    Borrower hereby grants to Lender, in order to secure all of the Obligations, a security interest in the following personal property of the Borrower, all of which shall be deemed to be included within the definition of "Collateral" as defined herein:
>
> (i)    All personal property of the Borrower, including without limitation all Inventory . . . , all Receivables . . . , all Fixtures and Equipment . . . , and all General Intangibles . . . , whether now owned or hereafter acquired or arising, and wherever located, together with all deposit accounts, supporting obligations and all products and proceeds therefrom . . . .

Stip. Ex. 1 (Loan Agreement) 13 § 6.1(b).  The Loan Agreement further defined "Collateral" as including "any substitutions for, accessions and modifications to and other additions and replacements for any of the Collateral any other rights or interests arising out of in connection with any of the Collateral."  Id. at 13 § 6.1(b)(i).  Because no UCC financing statement is on file, however, the security interest in the personal property is not perfected.

Steamboat Springs, N.A., 144 P.3d 1224, 1228 (Wyo. 2006).   And under Wyoming

Statute § 34-1-120, "[e]very conveyance of real estate within this state, hereafter made,

which shall not be recorded as required by law, shall be void, as against any

subsequent purchaser . . . ." Wyo. Stat. § 34-1-120.   A "conveyance" under the

Recording Statutes is "construed to embrace every instrument in writing by which any

estate or interest in real estate is created, alienated, *mortgaged* or assigned, or by

which the title to any real estate may be affected in law or equity . . . ." Wyo. Stat. § 34-

1-102 (emphasis supplied).

Security interests in other types of property, however, are primarily subject to

Wyoming's version of Article 9 of the UCC ("Article 9").   Article 9, in turn, excepts from

its requirements "the creation or transfer of an interest in or lien on real property,

including a lease or rents thereunder." Wyo. Stat. §34.1-9-109(d)(xi).   Thus, Article 9

perfection requirements do not apply to security interests in leases or rents *to the extent*

*that* they involve "the creation or transfer of an interest in or lien on real property." Id.

The case law is now replete with decisions addressing whether revenues

generated by a hotel are *rents*, and whether the room revenues are considered real or

personal property interests.   The context in which the issue is raised varies.   Some of

the cases involve issues of perfection – i.e., whether a security interest in hotel room

revenues must be perfected according to the dictates of UCC Article 9 or under the

state's real property recording statutes.[22]   The courts have gone both ways on this

---

[22] See Great-West Life & Annuity Assur. Co. v. Parke Imperial Canton, Ltd., 177 B.R. 843, 856
(N.D. Ohio 1994); In re Nendels-Medford Joint Venture, 127 B.R. 658, 662-63 (Bankr. D.
Oregon 1991); In re Ashoka Enters., Inc., 125 B.R. 845, 846 (Bankr. S.D. Fla. 1990);
Sacramento Mansion, Ltd. v. Sacramento Sav. & Loan Assoc. (In re Sacramento Mansion,
Ltd.), 117 B.R. 592, 601 (Bankr. D. Colo. 1990); Super 8 Motels, Inc. v. M. Vickers, Ltd. (In re M.
Vickers, Ltd.), 111 B.R. 332, 333 (D. Colo. 1990); Kearney Hotel Partners v. Richardson (In re

question, with some courts concluding that hotel room revenues are payments for the use of real property and security interests therein should be recorded under real property recording statutes, see, e.g. Travelers, 621 N.E. 2d 215-16, and others holding that hotel room revenues are not derived from the creation of an interest in real property and a security interest in those revenues must be perfected by filing an Article 9 financing statement, see, e.g., Kearney, 92 B.R. at 102.

In other cases, courts have examined the nature of hotel room revenues in determining whether they constitute *rents* to which a postpetition security interest could attach under the prior version of § 552.[23] And yet other cases have addressed the

---

Kearney Hotel Partners). 92 B.R. 95, 96 (Bankr. S.D.N.Y. 1988); Travelers Ins. Co. v. First Nat'l Bank of Blue Island, 621 N.E. 2d 209, 213 (Ill App. Ct. 1993).

[23] See, e.g., Parke Imperial, 177 B.R. at 851-52; Casco N. Bank v. The Green Corp. (In re The Green Corp.), 154 B.R. 819, 821-22 (Bankr. D. Me. 1993); In re Thunderbird Inn, Inc., 151 B.R. 224, 226 (Bankr. D. Ariz. 1993); In re Corpus Christi Hotel Partners, Ltd., 133 B.R. 850, 854 (Bankr. S.D. Tex. 1991); Greyhound Real Estate Fin. Co. v. Official Unsecured Creditor's Comm. (In re Northview Corp.), 130 B.R. 543, 548 (B.A.P. 9th Cir. 1991); Sacramento Mansion, 117 B.R. at 601.

Under § 552(a), property acquired postpetition is not subject to a prepetition security interest. Exceptions to that general rule are provided by § 552(b). Prior to 1994, § 552(b) extended prepetition security interests to postpetition property:

> if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law . . . .

Thus, even if a creditor had a valid prepetition security interest in hotel revenues, if those revenues did not constitute "proceeds, product, offspring, rents, or profits" of the debtor's property, then the creditor had no postpetition extension of its lien. In 1994, the Bankruptcy Code was amended to clarify that valid prepetition liens in hotel revenues extend postpetition to the extent they are valid prepetition whether or not they would be considered *rent* under any particular state's law, thus ending the debate as to whether valid prepetition liens on hotel revenues were rendered unenforceable postpetition solely on grounds that they were not *rents* within the meaning of subsection (b). The reference to *rents* in former subsection (b), now subsection (b)(1), was deleted, and a new subsection (b)(2) was inserted, which provides:

same issues in deciding whether hotel room revenues constitute cash collateral. [24]

### 1.   The Majority Approach: Perfection is Governed by the UCC

The Debtor is correct that a majority of the courts have held that hotel room revenues are not interests in real property, but constitute personal property, and that any lien on those revenues must be perfected by complying with Article 9 of the UCC. Many of those cases reject the notion that payment for use of a hotel room is an interest in real property because they are persuaded that hotel guests are "mere licensees and not tenants," and thus have only a personal contract with the hotelier and acquire no interest in realty. [25]   Because hotel guests, in their view, only receive a "'general intangible' in the nature of a license," Kearney 92 B.R. at 99, perfection of the security

---

if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and *to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate* after the commencement of the case to the extent provided in such security agreement.

11 U.S.C. § 552(b)(2) (emphasis supplied).  While this amendment rendered irrelevant any distinction between *rents* and hotel room revenues under former subsection (b), it does not resolve state law questions regarding the creation and perfection of security interests in hotel room revenues.

[24] In re HT Pueblo Prop., LLC, 462 B.R. 812, 818 (Bankr. D. Colo. 2011); In re Ocean Place Dev., LLC, 447 B.R. 726, 733-34 (Bankr. D.N.J. 2011); Nendels-Medford, 127 B.R. at 663; In re Shore Haven Motor Inn, Inc., 124 B.R. 617, 618 (Bankr. S.D. Fla. 1991).

[25] See Ocean Place, 447 B.R. at 732-33; Parke Imperial, 177 B.R. at 852, 858; Green Corp., 154 B.R. at 823-24; Sacramento Mansion, 117 B.R. at 606, 607; Kearney, 92 B.R. at 99 (quoting In re Greater & Atl. & Pac. Inv. Grp., Inc., 88 B.R. 356, 359 (Bankr. N.D. Okla. 1988)); 49 Am. Jur. 2d Landlord and Tenant 6 (1970).

interest is governed by Article 9.[26]

In reaching this determination, the courts have relied on distinctions drawn in case law and various state statutes between the landlord/tenant relationship and the hotel guest/innkeeper relationship.[27] And the same reliance on this landlord/tenant versus hotel guest/innkeeper distinction is found in cases considering whether hotel room revenues are *rents* under Article 9 or under the terms of the parties' underlying contract.[28] In those cases, the courts have similarly concluded that payments for use of a hotel room are either license or contract payments and, therefore, personal property and not *rents* within the meaning of the relevant statutory or contractual language.[29]

There is also some reliance in the case law on the view that hoteliers provide *services*, and that the provision of a room is incidental to that service. See, e.g., Green Corp., 154 B.R. at 824; Kearney, 92 B.R. at 101 ("as concerns the words 'rents thereunder,' what is referred to are the rents payable to the lessor under the provision of a lease, not charges made by the lessee for services it provides to its patrons, even though those services include furnishing rooms in the leased premises for the use of its guest") (quoting United States v. P.S. Hotel Corp., 404 F. Supp. 1188, 1192 (E.D. Mo. 1975), aff'd 827 F.2d 500 (8th Cir. 1976)).

---

[26] See also Ocean Place, 447 B.R. at 732; Parke Imperial, 177 B.R. at 858; In re Ashoka, 125 B.R. at 846; Shore Haven, 124 B.R. at 618; Sacramento Mansion, 117 B.R. at 607.

[27] See Ocean Place, 447 B.R. at 734-35; Green Corp., 154 B.R. at 824; Sacramento Mansion, 117 B.R. at 603, 606-07; Kearney, 92 B.R. at 100.

[28] HT Pueblo, 462 B.R. at 817; Nendels-Medford, 127 B.R. at 663; Vickers, 111 B.R. at 334, 336.

[29] See Ocean Place, 447 B.R. at 732; Green Corp. 154 B.R. at 824; Sacramento Mansion, 117 B.R. at 606, 607; Vickers, 111 B.R. at 336.

2.  The Minority Approach: Perfection is Governed by Land Recording
Statutes

On the other side of the debate are those courts that have disagreed with the
majority, holding instead that room revenues *are rents*, in the nature of an interest in
real estate.  Accordingly, a security interest in hotel room revenues *is* covered by an
assignment of rents clause, the reference to *rents* in Article 9, or the after-acquired
property exception in former § 552(b).  And, because the room revenues, as *rents*,
involve an interest in real property (at least to some degree), a security interest in those
revenues is perfected when recorded in the relevant land records.[30]

The courts taking the minority position have generally espoused a broader view
of the meaning of *rents*, as used either in former § 552(b) or the exception provision of
Article 9, with most concluding that the term *rent* contemplates all consideration paid for
use or occupancy of property.[31]  This is also the approach taken by the Restatement
(Third) of Mortgages, which defines *rents* as "proceeds payable by a lessee, licensee,

---

[30] Fin. Sec. Assur., Inc. v. Days Cal. Riverside Ltd. P'ship (In re Days Cal. Riverside Ltd. P'ship,
27 F.3d 374, 376-77 (9th Cir. 1994); T-H N. Orleans Ltd. P'ship v. Fin. Sec. Assur., Inc. (In re T-
H N. Orleans Ltd. P'ship), 10 F.3d 1099, 1105 (5th Cir. 1993); Bellevue Place Assocs. v. Caisse
Centrale Des Banques Populaires (In re Bellevue Place Assocs.), 173 B.R. 1009, 1018-19
(Bankr. N.D. Ill. 1994); In re S.F. Drake Hotel Assocs., 131 B.R. 156, 160-61 (Bankr. N.D. Cal.
1991); Pavilion Hotel, Inc. v. Valley Nat'l Bank of Ariz., 885 P.2d 186, 192 (Ariz. Ct. App. 1994);
accord In re Everett Home Town Ltd. P'ship, 146 B.R. 453, 457 (Bankr. D. Ariz. 1992)
(examining whether "suite revenues" at golf and racquet club are *rents* for purposes of former
version of § 552(b)); Mid-City Hotel Assocs. v. Prudential Ins. Co. of Am. (Mid-City Hotel
Assocs.), 114 B.R. 634, 642-43 (Bankr. D. Minn. 1990) (hotel room revenues are "profits" of the
real estate).

[31] See Fin. Sec. Assur., Inc. v. Tollman-Hundley Dalton, L.P., 74 F.3d 1120, 1124 (11th Cir.
1996); T-H New Orleans, 10 F.3d at 1105 ("[H]otel revenues are sufficiently 'like rent' under
Louisiana law to be included with the term 'rents' in § 552(b)."); Everett, 146 B.R. at 457 (courts
in the majority "may have taken too narrow a view of the term 'rent' as used in Section 552(b)");
S.F. Drake, 131 B.R. at 160  (hotel revenues are generated from payment for occupancy of real
property and are accordingly *rents*);  Pavilion Hotel, 885 P.2d at 191-92; Travelers, 621 N.E. 2d
at 213-14 ("this definition affords no basis for distinguishing a tenant from a hotel guest in
determining what is rent").

or other person for the right to possess, use, or occupy the real property of another."
Restatement (Third) of Property (Mortgages) § 4.2(a).  The comments to that section
explicitly state that the "definition includes hotel room charges," id. at cmt. (e), which are
accordingly "mortgageable to the same extent as any other interest in real property," id.
at cmt. (b).

In determining that hotel room revenues constitute *rents*, the minority courts have
seen little significance in the tenant/licensee distinctions relied on by the majority. As
one court explained:

> The content of the respective statutes shows the legislature's intent to
> mutually exclude the two kinds of relationships from the respective
> regulatory schemes . . . . [D]istinctions legislatively drawn for the purpose
> of establishing rights and duties *as between the parties to the relationship
> in question* have nothing whatsoever to do with the dispute at hand.

Mid-City Hotel, 114 B.R. at 640 n. 6 (emphasis supplied).[32]

The minority does not, therefore, conclude that hotel guests acquire nothing
more than a personal property right in a hotel room.  Rather, in the words of one court,
hotel room charges "arise primarily from the hotel occupant's use of the underlying real
estate and hence are an interest in real estate."  Travelers, 621 N.E. 2d at 214 (citing In
re Schaumburg, No. 87B 14301, 1989 WL 359490 (Bankr. N.D. Ill. Jan. 12, 1989)).  And
in Mid-City, even though the court held that hotel room revenues were not *rents*, but
rather "profits," the court disagreed with those cases that "focused upon the alleged

---

[32] See also Days California, 27 F.3d at 376 (while statutes and case law have in some cases
distinguished between landlord/tenant and innkeeper/guest relationships and in other cases
have referred to room revenues as *rents*, none of the statutes or cases answered the question
before the court); S.F. Drake, 131 B.R. at 159 (unrelated statutes referring to room rates or
distinguishing between tenant's rights and duties and those of a lodger "do not compel the
conclusion that hotel room revenues are accounts, rather than rents"); Pavilion Hotel, 885 P.2d
at 191 ("We fail to agree, however, that distinctions between the status of persons entitled to
occupy real property should determine whether hotel room revenues constitute rent.").

tenuousness of the connection between the mortgaged real estate and the revenues," as they "simply did not recognize the economic realities of the cases before them"; the room revenues were derived from interests in real estate subject to a mortgage and exempt from the UCC filing requirements.  114 B.R. at 642, 644.[33]

The minority also disagrees with the assertion that a hotel primarily provides services to its guests, and some courts expressly state that the provision of services is simply not a useful characteristic for distinguishing hotel room revenues from *rents*.[34] And finally, the Court must note the minority's determination that viewing hotel revenues as *rents* better comports with parties' intent and commercial expectations.  As explained by the Ninth Circuit Court of Appeals, "[t]o deprive the lender of what he bargained for at closing, especially when that expectation matches the intent of the borrower, is inequitable and ignores widely accepted lending practices of the business community." Days California, 27 F.3d at 377.[35]

---

[33] See also Days California, 27 F.3d at 377 ("In California, as elsewhere, the room rent is 'produced by the property' of the hotel."); T-H New Orleans, 10 F.3d at 1106 ("Guests are interested in a hotel room because of its physical characteristic and for a place to stay; this is not dependent on services or goods."); Everett, 146 B.R. at 457 ("[T]he main charge is for the occupancy of the property . . . ."); S.F. Drake, 131 B.R. at 159 ("The hotel guest's primary objective is shelter.  The shelter is provided by the land and improvements of the hotel."); Travelers, 621 N.E.2d at 213 ("The conclusion that room revenue is not rent generated by real property is counter-intuitive.  It is indisputable that the common understanding is that rent is compensation for use of property for shelter.").

[34] See T-H New Orleans, 10 F.3d at 1106; S.F. Drake, 131 B.R. at 159, 160 ("Certainly hotels provide services, but so also do apartment and office buildings.  Any services that a hotel provides are incidental to room occupancy."); Travelers, 621 N.E. 2d at 213-14 ("the commonly held view is that a hotel guest primarily seeks shelter not service;" services distinction between tenant and hotel guest "can become uselessly blurred . . . . [and] [r]evenues generated by the residential occupancy of real estate property should be 'rents,' without reference to the term of occupancy or level of services").

[35] See also T-H New Orleans, 10 F.3d at 1106 (where parties intended to create a lien on future hotel revenue and defined *rent* to include all economic benefits derived from occupancy of the hotel, that intent should not be defeated); S.F. Drake, 131 B.R. at 161; accord Mid-City, 114 B.R. at 642 (while not *rents*, security interest extended to hotel room revenues as "profits,"

### 3. <u>Perfection of the Mortgage on Room Revenues under Wyoming Law</u>

This Court agrees with the minority and finds that the Wyoming Supreme Court would rule that hotel room revenues are indeed *rents*, as that term is commonly understood, for the reasons so amply described by the minority courts. That conclusion comports with the "plain and ordinary meaning of the word[ ]," which the Wyoming Supreme Court looks to in interpreting state legislation. <u>Michael's Const., Inc. v. Am. Nat'l Bank</u>, 278 P.3d 701, 705 (Wyo. 2012).

The distinction between tenants and hotel guests does not answer the question of "what is *rent*?" As one commentator aptly noted in response to the argument that the tenant/hotel guest distinction informs the definition of *rent*: "[n]o one can question the premise that tenants pay rent, but it is quite another thing to say that *only* a tenant pays rent." R. Wilson Freyermuth, <u>Of Hotel Revenues, Rents, and Formalism in the Bankruptcy Courts: Implications for Reforming Commercial Real Estate Finance</u> ("<u>Hotel Revenues</u>"), 40 U.C.L.A. Law Rev. 1461, 1477 (1993). The minority view, as reflected in the Restatement, has the more logical answer: As payment for the right to "possess, use, or occupy the real property" of the Debtor, guests of the Inn paid *rent*. Restatement (Third) of Property (Mortgages) § 4.2(a). Accordingly, the Court concludes that the security interest in rents referred to in the Mortgage was intended to encompass the Room Revenues.[36]

---

based in part on the parties' intention that collateral would consist of "all economic fruits of [the] direct physical use of the real-property interest"); <u>Great-West Life Assur. Co. v. Raintree Inn</u>, 837 P.2d 267, 271 (Colo. App. 1992) (language of the rental assignment included all income from use of the property).

[36] The Debtor argues that language in the Mortgage indicates that the parties considered the security interest in Room Revenues to be subject to Article 9, because it states that "Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents." But the Mortgage is actually ambiguous on this issue – the sentence just prior to the

But the question under the only relevant Wyoming law is not whether the Room Revenues here can be *described* as *rents*, but whether the revenues "touch[ ] any interest in lands," Wyo. Stat. § 34-1-121, or relate to "the creation or transfer of an interest in or lien on real property," Wyo. Stat. §34.1-9-109(d)(xi).[37]

The various statutes referred to by the parties in this case are not particularly useful in making this determination.  Wells Fargo notes that hotel room revenues have been referred to as *rents* in certain Wyoming statutes,[38] but for the reasons just discussed, the Court does not find those references dispositive.  The Debtor has placed great emphasis on the distinctions in Wyoming law between landlord and tenant

---

one quoted provides that "Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property," without specifying that this is a "Uniform Commercial Code security interest."  And, in fact, the segue between the two sentences is the phrase "in addition."  This is more reflective of a "belt and suspenders" approach to drafting to ensure that, whether considered real or personal property, the Room Revenues would be subject to Wells Fargo's Mortgage.  That the lender here affixed the belt, but forgot to attach the suspenders, does not mean that the relevant garment must necessarily fall.

[37] Although concluding that hotel revenues were not interests in real property, the court in Parke Imperial also noted that the purely semantic debates regarding the meaning of *rents* was essentially irrelevant to determining how exactly to characterize hotel room revenues, since personal property is also often referred to as being *rented*, as are hotel rooms.  Parke Imperial, 177 B.R. at 858.  The Court agrees, noting that payment for the use of a vehicle, which is unquestionably an article of personal property, is most often referred to as *renting* a car, although an interest in those *rental* payments must be perfected pursuant to Article 9 of the UCC.  See, e.g. In re Gordon Car & Truck Rental, Inc., 80 B.R. 12, 15 (1987) (security interest in proceeds from "rental contracts" with customers perfected by UCC filing).

[38] Wells Fargo has directed the Court's attention to Wyoming Statute § 6-3-406 ("Public Establishment" means an establishment selling, or offering for sale, prepared food or beverages, or leasing or *renting* overnight sleeping accommodations to the public generally. "Public Establishment" is defined to include "hotels, motor hotels, motels and rooming houses, unless the *rental* thereof is on a month-to-month basis or for a longer period of time."); Wyoming Statute § 6-4-406 ("Premises" is defined to include a *rented*, leased or donated hotel or motel room").

relationships and innkeeper and guest relationships. [39]   The Court finds, however, that the statutes addressing tenant and landlord rights and duties contrasted with those of a lodger do not speak to the question of whether hotel room revenues or an assignment of those revenues "touches" upon a real property interest.  See, e.g. Freyermuth, Hotel Revenues, 40 U.C.L.A. Law Rev. at 1468. ("[T]he distinction between the remedies of the tenant and hotel guest merely clarifies their respective positions vis-à-vis the owner of the premises.  This distinction has no necessary consequence in characterizing the nature of their respective obligations.").

Clearly, the landlord-tenant relationship *does* involve an interest in an estate of land, and a security interest taken in such rents is perfected under the Recording Statutes.  And it is also clear that Wyoming recognizes that landlord/tenant relationships are distinguishable from innkeeper/guest relationships.  See, e.g., Flores v. Simmons, 999 F.2d 1310, 1312 (Wyo. 2000) (distinguishing duties of landlord/tenant from those of innkeeper/guest).   But that does not necessarily mean that anything less than the sort

---

[39] The Debtor directs the Court's attention to Wyoming Statutes § 6-3-406 (Under Wyoming law, hotels, motor hotels, motels and rooming houses are included in the definition of "Public establishment," and imposes criminal penalties for defrauding hotel operators which do not exist for defrauding landlords), § 6-3-406(b)(ii) (defining "Public establishments" to include "hotels . . . unless the rental thereof is on a month-to-month basis or for a longer period of time"),  § 33-17-104 (Hotel keepers are required to post "in plain view of any guest or guests occupying such room or rooms . . . the rate per day as applying to one (1) or more guests."), § 39-15-103(a)(i)(G)  (imposing excise tax on "[t]he sales price paid for living quarters in hotels, motels, tourist courts and similar establishments providing lodging service for transient guests"), § 33-17-103 (granting "[a]ny keeper of a hotel or boarding house or lodging house . . . a lien upon the baggage or other personal property of a person who shall have obtained board or lodging or both, from such keeper . . . ." if the guest failed to pay), § 1-21-1201 (defining *renter* as "any renter, lessee, tenant or other person entitled under a rental agreement to occupy a residential unit to the exclusion of others;" defining residential unit as "a renter's principal place of residence . . . excluding a mobile home lot or recreational property rented on an occasional basis;" creating rights, obligations, and remedies between "Owners" and "Renters"), § 34-2-128 (providing that "there shall not exist the relations of landlord and tenant, by implication or operation of law, except a tenancy by sufferance" occurring in specific situations upon the expiration of a term created by a lease).

of real property interest obtained by a tenant cannot be characterized as some lesser "interest" in land.  Hotel patrons pay to obtain the right to exclusive use of a piece of real estate (albeit small) for a period of time; "a hotel guest not only has the right to occupy building space for a delineated period, but he or she also has the right to exclude others, including, in many situations, the hotel management."  Reporter's Note, Restatement (Third) Property: Mortgages § 4.2.

While tenants may acquire an "estate" in land, *interests* in land are different from "estates in land."  See Darr v. Lone Star Indus., Inc., 94 Ca. App. 3d 895, 901 (1979) ("[a]n interest in land is not presumptively an estate in land").  Acknowledging the greater real property rights of a tenant does not require the Court to conclude that hotel guests have *no* interest in real property.  It is difficult to draw lines and definitional boundaries around all the possible rights and interests that can be obtained in real property.  However, sharp boundaries are not always to be found:

> [a]rrangements between landowners and those who conduct commercial operations upon their land are so varied that it is increasing difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as 'leases,' 'easements,' 'licenses,' 'profits,' or some other obscure interest in land devised by the common law in far simpler times.

Golden W. Baseball Co. v. City of Anaheim, 25 Cal. App. 4th 11, 36 (1994), superseded by statute on other grounds, as noted in Hubbard v. Brown, 785 P.2d 1183, 1185-86 (Cal. 1990).

The shades and complexities inherent in property interests, and the fallacy of attempting to "pigeonhole" every property interest into some traditional property concept, have long been recognized by the Wyoming Supreme Court.  That court has instead analyzed property interests in other contexts with an eye toward the "real world," and has not limited its property concepts to narrow, formalistic categories.  See, e.g.,

40

Flores, 999 P.2d at 1313 (noting that while a mobile home is deemed personalty in some contexts, under the facts of the case before it, it was "unquestionably a dwelling which may become the object of a landlord and tenant relationship."); Williams v. Watt, 668 P.2d 620, 623-24 (Wyo. 1983) (acknowledging a change in real property analysis to take account of modern circumstances and not wed to historical property concepts).

In Denver Joint Stock Land Bank of Denver v. Dixon, for instance, the Wyoming Supreme Court demonstrated its willingness to take account of modern circumstances, especially in relatively new areas of property law. Noting that historical concepts of real and personal property are not always equipped to encompass changing property concepts, the court opined with regard to traditional property labels and definitions that: "Terminology is convenient, and in fact necessary, but it should not be abused." 122 P.2d 842, 849 (Wyo. 1942).

This Court agrees with the minority view that common sense and experience compel the conclusion that hotel room charges "arise primarily from the hotel occupant's use of the underlying real estate and hence are an interest in real estate." Travelers, 621 N.E. 2d at 214.[40] The Court also finds that the Wyoming Supreme Court would conclude the same and hold that the Room Revenues constitute "an interest affecting real property," because they unquestionably "relate[ ] to and affect[ ] real estate." Elliot v. Sioux Oil Co., 191 F. Supp. 847, 850 (D. Wyo. 1960) (quoting Stone v. Wright, 75 F.2d 457, 460 (10th Cir. 1935)). Therefore, this Court holds that Wells Fargo properly perfected its security interest in the Room Revenues when it recorded its Mortgage with

---

[40] Said far less legalistically, the average hotel guest typically spends far more time choosing the location of a hotel and the location of a room within the hotel than evaluating hotels for the quality of food and turndown services or the variety of items in the gift shop.

the Teton County Clerk.[41]

### C. Application of Postpetition Payments

Pursuant to the Cash Collateral Order, "[a]s additional adequate protection for the use of Wells Fargo's alleged cash and non-cash collateral," the Debtor has been making monthly payments to Wells Fargo in the amount of $40,000.  The parties dispute whether, in determining the amount of the Secured Claim, those payments should be credited to the secured portion of Wells Fargo's claim vis-à-vis the Property – i.e., deducted from the value of the Property and hence from the total amount of the Secured Claim.

While a majority trend is developing, there remains a split among the courts as to the appropriate allocation of postpetition payments to an undersecured creditor with a secured interest in both real property and postpetition revenues.  As Judge Saris described in Beal Bank, S.S.B. v. Waters Edge Limited Partnership:

> The Maginot line is clearly drawn.  The "subtraction" cases hold that post-petition rent payments to the undersecured creditor should be subtracted from the secured portion of the creditor's claim as measured by the value of the real estate.  Conversely, the "addition" cases hold that the amount of post-petition rents not reinvested into real estate should be added to the size of the creditor's secured claim, and that payment of those rents decreases the total amount of the creditor's claim but not the secured portion of its claim as measured by the value of the real estate.

248 B.R. 668, 685 (D. Mass. 2000).  Judge Saris ultimately adopted the "addition" approach, id. at 686, and this Court agrees with that conclusion.

---

[41] It is unclear from the record whether the Debtor separately accounts for the Room Revenues and those derived from ancillary services and goods, such as sale of food and drink and provision of other services.  Those ancillary revenues are not derived from an "interest in real property," see, e.g. Days California, 27 F.3d at 377; Everett, 146 B.R. at 457, and are not subject to Wells Fargo's unperfected prepetition security interest.  The determination of the amount of actual Room Revenues generated postpetition, the Court assumes, will be made at a later date.

As previously discussed, § 506(a) provides that a secured creditor's claim is a secured claim to the extent of the value of the collateral. 11 U.S.C. § 506(a). The Court has already determined the value of the Property to be $9,900,000. Since the Court has also determined that Wells Fargo's security interest in the Room Revenues was validly perfected on the Petition Date, that security interest extends to postpetition Room Revenues by operation of 552(b)(2), which provides:

> (2)    . . . if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement . . . .

11 U.S.C. § 552(b)(2).

Because Wells Fargo's collateral consists of postpetition Room Revenues, the value of its Secured Claim has increased by operation of § 552(b) and § 506. In re Union Meeting Partners, 178 B.R. 664, 675 (Bankr. E.D. Pa. 1995); In re Vermont Inv. Ltd. P'ship, 142 B.R. 571, 573 (Bankr. D.C. 1992). The Room Revenues "constitute separate collateral apart from the underlying [Property] that generates the proceeds." In re Machinery, Inc., 287 B.R. 755, 764 (Bankr. E.D. Mo. 2002) (collecting cases). Wells Fargo's collateral thus "consists of the sum of [its] separate security interests in the [Property] *and* the accumulated post-petition rents." Beal, 248 B.R. at 686 (emphasis in original); see also In re Landing Assocs., Inc., 122 B.R. at 293. "Therefore, the accumulated rents must be added to the real Property in the valuation of [Wells Fargo's] secured claim." In re Columbia Office Assocs. Ltd. P'ship, 175 B.R. 199, 202-03

(Bankr. D. Md. 1994); see also In re Flagler-at-First Assocs., Ltd., 114 B.R. 297, 301

(Bankr. S.D. Fla. 1990).[42]

Accordingly, "[t]he result is essentially a 'wash' in that the additional collateral

value represented by the [Room Revenues] is to be set-off by the fact that [Wells Fargo]

has already received them during the course of the Chapter 11.  No further reduction of

the . . .  secured claim is appropriate."  Flagler, 114 B.R. at 302.[43]  The *aggregate* value

of Wells Fargo's claim has been decreased by the postpetition adequate protection

payments, but the amount of the Secured Claim has not.  See Union Meeting, 178 B.R.

at 677 (postpetition payments subtracted from the "amount of the aggregate claim," but

not from the secured portion).    Therefore,  in  connection  with  any  hearing  on

---

[42] This conclusion has been criticized primarily on grounds that the Supreme Court's decision in
United Savs. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988), prohibits
the court from finding that postpetition payments to an undersecured creditor are offset by a
concomitant increase in the value of a secured creditor's secured position.  See, e.g., In re Kalian, 169 B.R. 503,
506 (Bankr. D.N.H. 1994); In re IPC Atlanta Ltd. P'ship, 142 B.R. 547, 559 (Bankr. N.D. Ga.
1992); In re Reddington/Sunarrow Ltd. P'ship, 119 B.R. 809, 814 (Bankr. D.N.M. 1990); see
also In re Mullen, 172 B.R. 473, 479 (Bankr. D. Mass. 1994) (finding it inequitable to require
debtor to pay net rents to secured creditor, even though creditor had security interest in
postpetition rents, because it would be "inequitable" to allow bank to "substantially improve its
position . . . at the expense of the estate.").

As Judge Saris noted in Beal, however, and as the majority of courts has also
concluded, acknowledging that an undersecured creditor's secured claim increases postpetition
by operation of § 552(b) "does not rattle Timbers."  Beal, 248 B.R. at 868.  Nothing in Timbers
prohibits an increase in the value of a secured claim *as the result of a valid security interest in*
*postpetition property.*  Id.; see also Machinery, Inc., 287 B.R. at 765; Union Meeting, 178 B.R. at
675; In re Bloomingdale Partners, 155 B.R. 961, 975-76 (N.D. Ill. 1993); Vermont Inv., 142 B.R.
at 574.  This conclusion also necessarily rejects a static view of secured claim valuation,
recognizing that the amount of the secured portion of a claim may fluctuate for a variety of
reasons, including a change in the value of underlying real property, payments made to the
secured creditor postpetition, or the accumulation of postpetition collateral.  For an excellent and
thoughtful treatment of fluctuating values, their relation to secured claims, and their treatment
throughout the course of a Chapter 11 case, see In re SW Hotel Venture LLC, 460 B.R. 4, 26-32
(Bankr. D. Mass. 2012).

[43] See also Machinery, Inc., 287 B.R. at 767; Union Meeting, 178 B.R. 676 & n.8; Bloomingdale,
155 B.R. at 975; Vermont Inv., 142 B.R. at 573 (where postpetition rents constituted additional
collateral, "the rents – in equal amounts – both increased the bank's allowed secured claim . . .
and, by payment, decreased the bank's allowed secured claim.").

confirmation of the Plan, the Court will need to determine the value of the Room Revenues generated postpetition (less the Debtor's § 506(c) expenses[44]) and the total amount of postpetition adequate protection payments received through that date to determine the final value of Wells Fargo's Secured and Unsecured Claims.

### D. Postpetition Attorneys' Fees

Postpetition attorneys' fees and expenses may be awarded to an *over*secured creditor pursuant to § 506(b), if reasonable and provided for in the underlying agreement or pursuant to state law.    11 U.S.C. § 506(b).[45]    Because of the specific reference to oversecured creditors in that section, the Debtor argues that the failure to similarly provide for undersecured or unsecured creditors means that such fees are "categorically denied."    This *inclusion unius est exclusio alterius*[46] argument has previously been considered and rejected by this Court in In re Tricca, 196 B.R. 214 (Bankr. D. Mass. 1996).

In Tricca, the Court considered whether an oversecured creditor was entitled to

---

[44] As one court has explained, § 522(b) "subjects the extension of a creditor's pre-petition security interest in proceeds to proceeds generated post-petition to § 506(c)."    Machinery, Inc., 287 B.R. at 767.    Section 506(c) allows a debtor in possession to "surcharge" the secured creditor's collateral for expenses necessary to preserve the property.    11 U.S.C. § 506(c); Machinery, Inc., 287 B.R. at 767; Bloomingdale, 155 B.R. at 975 n.8.    Wells Fargo has not raised any contested § 506(c) matters here, and in fact consented to § 506(c) expenditures in agreeing to the Debtor's payment of expenses set forth in the budgets attached to the Cash Collateral Orders.

[45] Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

[46] "To express one thing is to exclude the other."    Bryan A. Garner, A Dictionary of Modern Legal Usage 432 (2d ed. 1995).

its *prepetition* legal fees, payment of which was contingent upon the debtor exercising her right of redemption in certain real property.  When the Trustee sold the property postpetition and paid the mortgagee its full principal and interest, the Court found that the Trustee had exercised that right of redemption, thus triggering the contingency. When the creditor then filed a request for its legal fees and expenses under § 506(b) notwithstanding its failure to include that entitlement under the note and mortgage, the Trustee objected on grounds that the fees and expenses were not specifically provided for in the underlying agreement between the creditor and the debtor.  The Court agreed with the Trustee's conclusion, holding that those fees could not be included as part of the creditor's secured claim pursuant to § 506(b).  Id. at 219.

But the Court further considered whether the fees were allowable as a general unsecured claim.  Noting that "[m]any cases . . .  seem to assume that where there is no agreement for payment of legal fees and costs, § 506(b) disallows an oversecured creditor's claim entirely," id. at 219, the Court explained why a closer look at the relevant Code provisions dictated otherwise:

> This Court believes that those cases read § 506(b) too broadly. Section 506(b) is not a provision which concerns itself with claim allowance.  Section 506(b) addresses only the question of what is part of an "allowed secured claim."  Those courts which have examined § 506(b) in conjunction with § 502 have concluded that § 506(b) does not create additional exceptions to the allowance of claims; rather it only provides for the classification of allowed claims as secured or unsecured.
>
> Therefore, while § 506(b) precludes a claim from assuming secured status, it is still necessary to examine 11 U.S.C. §§ 101(5) and 502(b) to determine whether the Bank's claim for legal fees and costs may be allowable as an unsecured claim.
>
> Pursuant to § 101(5)(A), a claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  A contingent claim is one marked by

46

> uncertainty as to whether any obligation will ever arise.  As this circuit has recognized, the term "claim" is broad enough to encompass an unliquidated, contingent right to payment even though the triggering contingency does not occur until after the filing of the petition.  Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.), 954 F.1, 8 (1st Cir. 1992).
>
> . . .
>
> A claim, as defined in § 101(5), is deemed allowed unless it is objected to by a party in interest.  § 502(a) and (b).  Sections 502(b)(1)-(8) set forth categories of claims that may not be allowed.  Contingent legal fees and costs are not among those prohibited claims.  Since the Bank's contingent claim for legal fees and costs is not disallowed by any of the provisions of § 502(b), the Bank has a valid pre-petition claim for legal fees and costs.
>
> Therefore, this Court holds that where a creditor's claim for legal fees and costs may not be maintained under § 506(b) as an allowed secured claim . . . the creditor may still enjoy an unsecured claim for such fees and expenses.

In re Tricca, 196 B.R. at 219-221 (additional citations omitted).  The Court reaffirms this legal analysis, as it was reinforced by the First Circuit in UPS Capital Business Credit v. Gencarelli (In re Gencarelli), 501 F.3d 1, 5 (1st Cir. 2007) ("Section 502, not section 506(b), affords the ultimate test for allowability, and any claim satisfying that test is, at the very worst, collectible as an unsecured claim.").

But the Tricca issue is distinguishable from that before this Court.  In Tricca, the asserted claim was for legal fees and expenses incurred *prepetition*.  Here, the issue relates to legal fees and expenses incurred *postpetition*.  And with respect to whether postpetition legal fees and expenses incurred by an undersecured creditor are allowable as a general unsecured claim, there is a split of authority.

In SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.), the Ninth Circuit Court of Appeals held that "the parties' execution of a prepetition agreement containing an attorneys' fees provision gives rise to a contingent, unliquidated attorney-fee claim."

571 F.3d 826, 843 (9th Cir. 2009). Interpreting the definition of "claim" under § 101(5)(A), the Ninth Circuit found that the "right to collect the fee existed prepetition" even though the fees were not incurred until after the case was filed. Id.[47]

In Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.), the First Circuit Court of Appeals similarly concluded that a contingent right to payment could constitute a prepetition claim under § 101(5)(A) and § 502(b), even though the contingency occurred postpetition. 954 F.2d 1, 8 (1st Cir. 1992); see also Tricca, 196 B.R. at 220-221. In Hemingway, the First Circuit considered whether a prepetition indemnification contract created a prepetition contingent right to payment that constituted a claim under §§ 101(5) and § 502(b). In determining that the indemnification contract *was* a prepetition claim, despite the fact that the contingency did not occur until after the petition date, the First Circuit recognized that an indemnity agreement creates an *existing* "right to payment, albeit contingent, *upon the signing of the agreement.*" Hemingway, 954 F.2d at 8 n.9 (emphasis supplied) (quoting In re M. Frenville Co., 744 F.2d 332, 336 (3d Cir. 1984), overruled on other grounds by In re Grossman's, Inc., 607 F.3d 114 (3d Cir. 2010)).[48]

---

[47] See also Qmect, Inc. v. Burlingame Capital Partners II, L.P. (In re Qmect, Inc.), 368 B.R. 882, 884 (N.D. Cal. 2007) (prepetition agreement allowing assessment of attorneys' fees created a "contingent liability" under § 101(5) and was includable as part of unsecured claim); In re New Power Co., 313 B.R. 496, 507-08 (N.D. Ga. 2004) (§ 502(b) does not bar recovery of postpetition attorneys' fees based on prepetition contract as part of unsecured claim, as the right to the fees was an unliquidated, contingent, or unmatured claim within the meaning of § 101(5)); In re Fast, 318 B.R. 183, 193 (Bankr. D. Colo. 2004) (adopting New Power rationale and holding that a prepetition contract allowing assessment of attorneys' fees constituted a contingent, unliquidated, unmatured claim; postpetition fees thus allowed as unsecured claim).

[48] Although Frenville has been criticized on grounds that the court failed to account for the breadth of the definition of "claim" in the Bankruptcy Code, the court's characterization of an indemnity agreement as creating an existing right to payment at the time the agreement is signed has not been the target of that criticism. See Mark S. Scarberry, Interpreting Bankruptcy Code Sections 502 and 506: Post-Petition Attorneys' Fees in a Post-Travelers World, 15 Am.

But the First Circuit has not held that all prepetition contractual rights to payment of attorneys' fees are prepetition contingent claims under §§ 101(5)(A) and § 502(b). In a post-<u>Hemingway</u> case, in fact, the First Circuit implied just the opposite. <u>See</u> <u>Adams v. Zimmerman</u>, 73 F.3d 1164 (1st Cir. 1996). In <u>Adams</u>, the First Circuit was called upon to interpret provisions under the National Bank Act governing claims against an insolvent financial institution to determine whether an entity claiming entitlement to attorneys' fees had a "provable" claim against the bank "on the date of insolvency." <u>Adams</u>, 73 F.3d at 1177. The court noted that "[t]he availability of attorneys' fees for an unsecured creditor depends on *whether they accrued* pre-insolvency or whether they accrued post-insolvency. Those incurred prior to the insolvency are recoverable while those incurred afterwards are not." <u>Id.</u> The Court then went on to note that this line between pre- and post-insolvency regarding the allowance of attorneys' fees was "analogous to requests for attorneys' fees in the bankruptcy context." <u>Id.</u> In making this analogy, the Court implicitly rejected the notion that a contractual provision allocating payment of attorneys' fees would automatically create a "contingent" claim for fees ultimately incurred postpetition. Instead, the Court noted that "[p]repetition attorneys' fees of unsecured creditors against an insolvent debtor are generally allowed under the bankruptcy code to the extent the applicable law so provides, and post-petition

---

Bankr. Inst. L. Rev. 611, 622 n.70 (2007). While Wells Fargo relies on the Second Circuit's holding in <u>Ogle v. Fidelity & Deposit Co. of Md.</u>, 586 F.3d 143 (2d Cir. 2009), in support of its request to include postpetition attorneys' fees in its unsecured claim, the Court finds <u>Ogle</u> distinguishable on the same grounds as <u>Hemingway</u>. Although the <u>Ogle</u> court characterized the issue broadly as whether an "unsecured creditor [is] entitled to recover post-petition attorneys' fees that were authorized by a pre-petition contract but were contingent on post-petition events," the underlying contract providing for the attorneys' fees was an indemnity agreement. <u>Id.</u> at 145. The Second Circuit noted, as did the First Circuit in <u>Hemingway</u>, that "[u]nder contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed." <u>Id.</u> at 146.

attorneys' fees are generally not allowed." Id.

And more recently, in Gencarelli, the First Circuit was careful to avoid any indication that it meant to obliterate the line between allowability of pre- and post-petition attorneys' fees. In that case, the First Circuit held that, where an estate is *solvent*, a prepetition contractual right to a prepayment penalty could be asserted against the debtor's estate as an unsecured claim even though the penalty was "unreasonable" and could not therefore be included in the creditor's secured claim under § 506(b). Stating that there was "no principled basis for treating attorneys' fees differently from prepayment penalties" in the context of the case before it, Gencarelli, 501 F.3d at 6 n.1, the court held that "unsecured creditors may recover their attorneys' fees, costs and expenses *from the estate of a solvent debtor* where they are permitted to do so by the terms of their contract and applicable non-bankruptcy law." Id. (quoting Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 683 (6th Cir. 2006)). Emphasizing that the bankruptcy estate was solvent and that all creditors would be paid in full, the Gencarelli court took care to note that its "opinion should not be construed as speaking to the different question of whether an unsecured creditor can enforce a contractual right to post-petition fees against the estate of *insolvent* debtor under section 502." Gencarelli, 501 F.3d at 7 (emphasis in original).

This Court believes that, while no First Circuit case is directly on point, both the holdings and *dicta* in Hemingway, Adams, and Gencarelli strongly indicate the First Circuit's view that, where the bankruptcy estate is unable to pay all other creditors in full, postpetition attorneys' fees are not allowable as part of an unsecured claim even where provided for in the underlying contract. The Court therefore declines to adopt the

position taken in <u>SNTL</u>, as urged by Wells Fargo.  And even not compelled to so by its

analysis of First Circuit decisions, this Court would similarly conclude, as have others,

that:

> a prepetition contract for postpetition legal services does not give the
> attorney a claim against the estate.  Under 11 U.S.C. § 101(5)(A), a 'claim'
> includes any contingent right to payment, but . . . the attorney in this case
> accrued a 'claim' only when he actually provided the postpetition services
> for which the debtor agreed to pay him; therefore, his 'claim' is not a
> prepetition claim against the estate but a postpetition claim . . . .

<u>Knutson v. Tredinnick (In re Tredinnick)</u>, 264 B.R. 573, 577 (B.A.P. 9th Cir. 2001)

(Tashima, J. concurring) (quoting <u>In re Hines</u>, 147 F.3d 1185, 1192 (9th Cir. 1998)).[49]

Accordingly, Wells Fargo's Unsecured Claim may not be augmented by the

inclusion of any postpetition attorneys' fees.

---

[49] <u>See also</u> <u>In re Seda France, Inc.</u>, Slip Copy, No. 10-12948-CAG, 2011 WL 3022563, *4
(Bankr. W.D. Texas July 22, 2011) ("§ 502(b) allows a claim in an amount determined at the
petition date.  Subsequent increased amounts are part of the post-petition claim not allowed
under § 502(b)."); <u>In re Electric Machinery Enters., Inc.</u>, 371 B.R. 549, 551 (M.D. Fla. 2007)
(plain language of § 502(b) requires determination of claim as of petition date and does not
include post-petition attorney fees); <u>In re Global Indus. Tech., Inc.</u>, 344 B.R. 382, 386 (Bankr.
W.D. Pa. 2006) ("Because postpetition attorneys' fees have not been incurred on the date the
bankruptcy is filed, a claim cannot include postpetition fees"); <u>In re Miller</u>, 344 B.R. 769, 772
(Bankr. W.D. Va. 2006) ("Just applying the plain words of the statute to the issue compels a
conclusion that a creditor's legal expense incurred *after* the filing date cannot be part of the debt
owing on the filing date."); <u>In re Global Indus. Tech., Inc.</u>, 327 B.R. 230, 240  (Bankr. W.D. Pa.
2005) ("§ 502(b) of the Bankruptcy Code requires a court to calculate the amount of a claim as
of the petition date.  It is axiomatic that, as of the petition date, postpetition attorneys' fees have
not been incurred.  Thus, unsecured prepetition claims cannot include postpetition attorneys'
fees."); <u>In re Biazo</u>, 314 B.R. 451, 458 (Bankr. D. Kansas 2004) ("Claims against a bankruptcy
estate are generally limited under § 502(b) to those owed as of the date of the filing of the
debtor's bankruptcy petition.  Postpetition attorney fees and costs are ordinarily not allowable,
even if the creditor has a contract, enforceable under applicable nonbankruptcy law, that
provides for their recovery from the debtor."); <u>Pride Companies, L.P. v. Johnson (In re Pride
Companies, L.P.)</u>, 285 B.R. 366, 375 (Bankr. N.D. Tex. 2002) ("Section 502(b) directs that the
court 'shall determine the amount of [a] claim as of the date of the filing of the petition . . . .
Postpetition attorney's fees cannot, therefore, be included as part of a claim at the time the
petition is filed.").

IV.    CONCLUSION

The Court finds that the value of Wells Fargo's real property collateral (the Property) is $9,900,000.   The Court also rules that Wells Fargo holds a perfected prepetition security interest in the Room Revenues, and that security interest extends to the postpetition revenues by operation of § 552(b)(2).   The postpetition adequate protection payments thus reduced the total amount of Wells Fargo's claim, but did not reduce the amount of the Secured Claim.   Finally, the Court holds that Wells Fargo's postpetition attorneys' fees and expenses are not recoverable as part of its unsecured claim.

Consistent with the Debtor's representation that an amended plan and disclosure statement would be filed within 14 days from the issuance of this Memorandum, the Debtor will be ordered to file its amended disclosure statement and plan on or before July 27, 2012.   At the hearing on confirmation of the Debtor's amended plan, the Court will determine the final amounts of Wells Fargo's Secured and Unsecured Claims in accordance with the findings and rulings set forth herein.   An order in conformity with this Memorandum shall issue forthwith.

DATED:  July 16, 2012

_____
Henry J. Boroff
United States Bankruptcy Judge